[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-16341
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 6, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00139-CR-2-WKW-SRW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN UBALDO-VIEZCA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(October 6, 2010)

Before EDMONDSON, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Juan Ubaldo-Viezca appeals his convictions and 255-month total sentence

for importation of five kilograms or more of cocaine and possession with intent to distribute five kilograms or more of cocaine. Ubaldo-Viezca argues that the district court erred in (1) denying his motion to suppress incriminating statements and evidence discovered during a vehicle search and failing to conduct an independent hearing; (2) denying his motion *in limine* to exclude firearms that were found during a search of his home in Texas; and (3) imposing a substantively unreasonable sentence. For the reasons set forth below, we affirm.

## I.

A federal grand jury charged Ubaldo-Viezca with importation of five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 952 and 960; and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Ubaldo-Viezca pled not guilty to both charges.

Prior to trial, Ubaldo-Viezca moved to suppress incriminating statements and evidence discovered during a traffic stop. He argued that he was questioned and advised of his *Miranda*[1] rights in English, even though he spoke Spanish, and that the officer who conducted the traffic stop did not have reasonable suspicion to continue detaining him after the initial stop.

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The government responded that Ubaldo-Viezca lacked standing to challenge the search of a trailer attached to the vehicle in which he was riding, because he was merely a passenger and did not own the vehicle or trailer that were searched. It also argued that the officer who conducted the stop had reasonable suspicion of criminal activity, based on his observations of, and conversations with, Ubaldo-Viezca and the driver.

At the suppression hearing, Will Barnes, an Alabama State Trooper, testified that, on June 26, 2007, he stopped Azecunas Garcia's vehicle for speeding. The vehicle, an Expedition, was pulling a dual-axle utility trailer. When Barnes approached the vehicle, Ubaldo-Viezca, the passenger, spoke for Garcia and stated that they had not wanted to make any sudden movements because there had been "problems in [their] area with the police." Garcia informed Barnes that she did not have the registration for the vehicle, although she produced a title and stated that she had recently purchased the vehicle. Barnes instructed Garcia to step out of the vehicle so that he could speak to her alone, because Ubaldo-Viezca "appeared to be attempting to control the stop." When Barnes noted that Garcia's name was not listed on the title, Garcia informed Barnes that she had not purchased the vehicle, but had been given the vehicle as payment for a debt. Barnes asked for Garcia's proof of insurance, which she could not produce. Garcia stated that she and

3

Ubaldo-Viezca were traveling to North Carolina to purchase cars at an auction, while Ubaldo-Viezca stated that the auction was in South Carolina.

Barnes attempted to verify Garcia's and Ubaldo-Viezca's information by calling the Blue Light Operation Center ("BLOC"). While Barnes waited to hear from BLOC, he gave Garcia the warnings he had issued and returned the title and Ubaldo-Viezca's and Garcia's licenses. Garcia informed Barnes that she was once arrested for smuggling people into the country, and that she sometimes still smuggled individuals into the country. Garcia also told Barnes that Ubaldo-Viezca was her boyfriend and her business partner, but she did not know his name. Garcia stated that both she and Ubaldo-Viezca owned the trailer, but later stated that the trailer was only in her name. After 20 or 25 minutes, Barnes had not heard from BLOC, so he called again and obtained the information he needed.

The BLOC check revealed that both the Expedition and the trailer were registered to Garcia, that Garcia's license was valid, and that Garcia had an alias and multiple prior arrests for alien smuggling. The check also revealed that Ubaldo-Viezca was a suspect in an ongoing narcotics investigation. Barnes then asked Garcia for consent to search the vehicle, which Garcia granted. Before Barnes searched the vehicle, Ubaldo-Viezca asked to speak to him in private. Ubaldo-Viezca told Barnes that he was a criminal informant working for a Drug

Enforcement Administration ("DEA") agent named Norris Rogers, who worked out of the Houston office. Ubaldo-Viezca could not produce a phone number for Rogers. A search of the Expedition revealed nothing of evidentiary value. Barnes conducted an "echo test" on the axles of the trailer by striking the axle with his flashlight. The test indicated that something was inside the axle. Because traffic was becoming increasingly heavy, Barnes asked Ubaldo-Viezca to drive the Expedition to the trooper auto shop, where he could take the trailer apart and look inside the axles.

Upon arriving at the trooper shop, Ubaldo-Viezca immediately told Barnes that he needed to speak to him again. Ubaldo-Viezca told Barnes that he was currently working on a deal for the DEA. Barnes then stated "let me guess. There's dope in the axles." Ubaldo-Viezca stated that there was. Barnes asked him how much cocaine was inside, and Ubaldo-Viezca responded, "I'm not going to lie. It's eight kilos." The officers took apart the trailer and discovered 16 packages, containing a total of 8 kilograms of cocaine, inside the axles. After the cocaine was discovered, Ubaldo-Viezca was advised of his *Miranda* rights.

Joe Herman, a Special Agent with the Alabama Bureau of Investigation, contacted Agent Rogers, who stated that Ubaldo-Viezca had been a DEA source ten years ago. Ubaldo-Viezca gave Herman written consent to search his residence

in Friendswood, Texas. Inside Ubaldo-Viezca's residence, agents found a large number of weapons, but no narcotics or large sums of money.

The magistrate issued a report and recommendation ("R&R"), recommending the denial of Ubaldo-Viezca's motions to suppress. As an initial matter, the magistrate determined that Ubaldo-Viezca lacked standing to challenge the search of the Expedition and trailer, because he was not the driver or owner of either the vehicle or the trailer and, therefore, did not have a legitimate expectation of privacy in either piece of property. The magistrate determined that the duration of the traffic stop was reasonable, in light of the discrepancies in the vehicle's title and registration, Ubaldo-Viezca's voluntary effort to talk with Barnes, the time that it took to key in and print the citations, and Barnes's attempt to contact a BLOC operator. The magistrate also found that Barnes had a reasonable, articulable suspicion that illegal activity was occurring, which justified Barnes's decision to prolong the stop. The magistrate found that Ubaldo-Viezca's pre-*Miranda* incriminating statements were admissible, because *Miranda* warnings generally are not required during ordinary traffic stops. The district court adopted the R&R and denied Ubaldo-Viezca's motions to suppress.

Prior to trial, Ubaldo-Viezca filed a motion *in limine* to exclude from evidence the weapons seized from his home. He asserted that the weapons related

6

to uncharged conduct and were not "germane to the issues before [the court]."

The district court denied Ubaldo-Viezca's motion to exclude the weapons seized from Ubaldo-Viezca's home, noting that the weapons were found the day after Ubaldo-Viezca was arrested.

At trial, Barnes testified that the eight kilograms of cocaine hidden in Garcia's trailer were attached to straps that were used to pull the packages of cocaine out of the axle.

Herman testified that Garcia informed him that, on Saturday, June 23, 2007, she and Ubaldo-Viezca drove her Chevrolet Silverado and a trailer to Sabinas, Mexico. The following Monday, they drove to her home in Rosharon, Texas. From there, Ubaldo-Viezca took the Silverado and the trailer, leaving Garcia at her house. The next day, Ubaldo-Viezca returned to Garcia's home, and the two began their trip to the Carolinas in the Expedition. Herman noted that Ubaldo-Viezca had stated that he and Garcia traveled to Mexico and re-entered the United States with the trailer while an unknown Hispanic male followed them. When Ubaldo-Viezca and Garcia stopped in Texas, the unidentified man informed Ubaldo-Viezca that there was cocaine in the trailer, and that they should drive it to South Carolina.

David Henderson, an agent with Immigrations and Customs Enforcement ("ICE"), testified that a border crossing document indicated that a Chevrolet truck

7

owned by Garcia crossed into the United States from Mexico on June 25, 2007. The same vehicle had crossed into Mexico from the United States on June 23, 2007.

Garcia testified that she and Ubaldo-Viezca traveled to Mexico on five occasions. During the fourth trip, Garcia watched Ubaldo-Viezca load cocaine into the axles of a trailer attached to the truck. Garcia would then drive her truck into the United States while Ubaldo-Viezca followed her in a separate vehicle. Garcia would leave her truck at Ubaldo-Viezca's home and Ubaldo-Viezca would call Garcia when he was ready. They would then drive Garcia's truck to either North Carolina or Chicago.

During the fifth trip to Mexico, Garcia watched Ubaldo-Viezca place the cocaine inside the trailer. She noted that he attached a rope to the packages so that it would be easier to remove the cocaine from the axles. On either the fourth or fifth trip into Mexico, Ubaldo-Viezca placed a large firearm behind one of the door panels of Garcia's truck by unscrewing the door panel. The firearm was too large to fit in the door, so Ubaldo-Viezca had to dismantle the gun and place the pieces in the door.

After Garcia's testimony, Ubaldo-Viezca renewed his motion *in limine* to exclude from evidence the weapons found in his home. The court noted that there

was some testimony about Ubaldo-Viezca storing a firearm in the door of Garcia's vehicle on one occasion, and there was temporal proximity between the discovery of the weapons at his home in Texas and the charged drug offenses. The court found that the type of weapons that were found led to the conclusion that "they are not unduly prejudicial." It therefore, overruled Ubaldo-Viezca's motion to exclude the firearms.

Eric Leland, a police officer in League City, Texas, testified that he searched Ubaldo-Viezca's home on June 27, 2007. Leland stated that, in the home, officers found two 37-millimeter grenade launchers, an M9 grenade launcher, an AR-style assault rifle, two "machine pistols," two pieces of an AK-47-type assault rifle, three revolver pistols, a .22 caliber long rifle, a small caliber revolver, a 12-gauge shotgun, and a .243 caliber rifle with a scope on top. Leland also identified several bulletproof vests found in Ubaldo-Viezca's home, including one vest that contained an apparent bullet hole and blood stain. After Leland's testimony, the parties rested. The jury found Ubaldo-Viezca guilty of both counts.

The presentence investigation report ("PSI") set Ubaldo-Viezca's total offense level at 38, which combined with his criminal history category of I, to yield a guideline imprisonment range of 235 to 293 months. Pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 960(b)(1)(B), Ubaldo-Viezca was subject to a mandatory

9

minimum of ten years' imprisonment and a maximum term of life imprisonment.

At sentencing, the district court adopted the PSI's guideline calculations. Ubaldo-Viezca asked the court to consider that he was 50 years old, had several children, and had no prior criminal history. Ubaldo-Viezca himself addressed the court, stating that Garcia was desperate and did not want to accept responsibility for her actions. He stated that, if he was responsible for transporting the cocaine, he would have pled guilty and admitted his mistake. Ubaldo-Viezca stated that he had no money and Garcia offered to pay him.

The government responded that Ubaldo-Viezca was a dangerous man and one of the most important people in the drug business, because, without transporters such as Ubaldo-Viezca, the drugs would never have arrived in Alabama. The government asked the court to sentence Ubaldo-Viezca at the high end of the guideline range, because of the dangerousness of the firearms found in his home, the drug quantity involved, and Ubaldo-Viezca's lack of remorse and denial of guilt.

The court stated that it had considered the sentencing guidelines and the 18 U.S.C. § 3553(a) sentencing factors, and it sentenced Ubaldo-Viezca to a term of 255 months' imprisonment on Counts 1 and 2, to run concurrently. It stated that the sentence was "sufficient but not greater than necessary to comply with the

statutory purposes of sentencing," and that the sentence was reasonable in light of the "nature and circumstances of the offense and the history and characteristics of the defendant." It also determined that the sentence was necessary

> to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct . . . to protect the public from further crimes of this defendant . . . to provide the defendant with needed correctional treatment in the most effective manner and to avoid the unwarranted sentence . . . to avoid unwarranted sentencing disparities among defendants.

## II.

### A. *Motion to Suppress*

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Zapata*, 180 F.3d 1237, 1240 (11th Cir. 1999). We review the district court's findings of fact for clear error, but review *de novo* the application of law to those facts. *Id.* "[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below." *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000).

#### i. *Search of Garcia's Vehicle and Trailer*

A party seeking to challenge a search on Fourth Amendment grounds must establish that he has a legitimate expectation of privacy in the searched area. *Rakas v. Illinois*, 439 U.S. 128, 143-44, 99 S.Ct. 421, 430-31, 58 L.Ed.2d 387

(1978). "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir.), *cert. denied*, 129 S.Ct. 569 (2008). "[A] passenger[] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." *United States v. Lee*, 586 F.3d 859, 864 (11th Cir. 2009), *cert. denied*, 130 S.Ct. 2392 (2010) (quotation omitted).

The district court correctly held that Ubaldo-Viezca lacked standing to challenge the search of the vehicle and trailer. Because Ubaldo-Viezca was merely a passenger and did not own or rent the vehicle, he could not raise a Fourth Amendment challenge to the search of the vehicle. *See Lee*, 586 F.3d at 864. Furthermore, since Ubaldo-Viezca did not have a legitimate expectation of privacy in the vehicle in which he was riding, it follows that he also did not have a legitimate expectation of privacy in the trailer, owned by Garcia, that was being pulled behind that vehicle. *See id.*; *Harris*, 526 F.3d at 1338. Although Ubaldo-Viezca appears to argue that the Supreme Court, in *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007), held that passengers have standing to challenge vehicle searches, *Brendlin* addressed a passenger's standing

to challenge the constitutionality of the initial traffic stop, rather than the search of the vehicle in which he is riding. *See Brendlin*, 551 U.S. at 254, 256-58, 127 S.Ct. at 2405-07. Accordingly, the district court did not err in finding that Ubaldo-Viezca lacked standing to challenge the search of the Expedition and trailer.

### ii.      *Incriminating Statements Made Prior to Miranda Warnings*

To comport with the Fifth Amendment's prohibition against compelled self-incrimination, a person taken into custody must be advised of his right to remain silent and his right to counsel prior to an interrogation. *Miranda*, 384 U.S. at 478-79, 86 S.Ct. at 1630. *Miranda* only applies where "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

Ordinary traffic stops do not involve custody for purposes of *Miranda*, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). In determining whether a defendant's freedom was curtailed "to a degree associated with formal arrest," we consider the totality of the circumstances, including whether the officers brandished weapons or touched the defendant,

13

whether the officers used a language or tone indicating that compliance with their orders could be compelled, and the location and length of the detention. *United States v. Luna-Encincas*, 603 F.3d 876, 881 (11th Cir. 2010).

The "functional equivalent" of interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301-02, 100 S.Ct. at 1689-90. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in *Miranda*]." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630.

The district court correctly found that Ubaldo-Viezca's initial statement to Barnes, at the scene of the traffic stop, was admissible, because it was made spontaneously. Ubaldo-Viezca summoned Barnes, stating that he needed to speak with him, and voluntarily informed him that he was working as an agent for the DEA. Thus, *Miranda* warnings were not required. *See id.*

With respect to Ubaldo-Viezca's statements to Barnes at the trooper shop, his initial statement that he was currently working undercover for the DEA was admissible, because it was also made voluntarily. *See id.* The record reflects that Ubaldo-Viezca summoned Barnes and voluntarily made this statement. However,

14

after Ubaldo-Viezca made this statement, Barnes stated "let me guess. There's dope in the axles." Barnes also asked a follow-up question concerning the amount of cocaine in the trailer. These statements are the "functional equivalent of interrogation," because they are "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301-02, 100 S.Ct. at 1689-90. Nevertheless, for *Miranda* to apply, Ubaldo-Viezca must have been "in custody" at the time that he made the statements. *Id.* at 300-01, 100 S.Ct. at 1689.

The totality of the circumstances indicate that Ubaldo-Viezca was not "in custody" when he made the statements to Barnes at the trooper shop, because his freedom was not restricted to a degree associated with a formal arrest. *Berkemer*, 468 U.S. at 440, 104 S.Ct. at 3150; *Luna-Encinas*, 603 F.3d at 881. First, although the traffic stop had lasted for over an hour by the time Ubaldo-Viezca made the statement, the stop had been extended based on Garcia's consent to search the vehicle. Furthermore, there is no evidence that Ubaldo-Viezca objected to the length of the stop or indicated that he wished to leave. In fact, he voluntarily complied with Barnes's request for him to drive the Expedition to the trooper shop. In addition, although Ubaldo-Viezca made his statements about the cocaine in response to Barnes's remarks and questions, Ubaldo-Viezca initiated the conversation by asking to speak with Barnes. The nature of Barnes's

15

comment—"let me guess. There's dope in the axles"—also indicates that the tone and nature of the interaction was casual, rather than serious. *See Luna-Encinas*, 603 F.3d at 881. Finally, there is no evidence that Barnes brandished a weapon, touched Ubaldo-Viezca, or otherwise restricted Ubaldo-Viezca's freedom of movement at the time that he made the statements. *See id.* Accordingly, because Ubaldo-Viezca was not "in custody" at the time that he made the incriminating statements to Barnes at the trooper shop, the district court did not err in admitting the statements.

### iii.    *Duration of the Stop*

Generally, a traffic stop "must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999). "[P]olice officers conducting a traffic stop may prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003). An officer also may lengthen a stop for "further questioning beyond that related to the initial stop" in two circumstances. *Pruitt*, 174 F.3d at 1220. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion [that] illegal activity has occurred or is occurring." *Id.* "Second, further questioning unrelated to the

16

initial stop is permissible if the initial detention has become a consensual encounter." *Id.*

The evidence presented at the suppression hearing established that, after obtaining Garcia's and Ubaldo-Viezca's driver's licenses and determining that Garcia had no valid registration for the vehicle, Barnes called BLOC to verify the information he was provided. Although it took 20 to 25 minutes for this information to be verified through BLOC, Barnes was permitted to prolong the detention during this time, because he was investigating the driver's license and vehicle registration. *See Boyce*, 351 F.3d at 1106. Furthermore, by the time Barnes had completed the BLOC check, he had a reasonable, articulable suspicion to believe that illegal activity was occurring, based on (1) Ubaldo-Viezca's attempt to "take over" the traffic stop and speak for Garcia, who was the driver, (2) Garcia's conflicting statements as to whether she purchased the Expedition or was given the Expedition as payment for a debt, (3) Garcia's and Ubaldo-Viezca's conflicting statements regarding their destination, (4) Garcia's and Ubaldo-Viezca's conflicting statements regarding how they would pay for the vehicles they intended to purchase, (5) Garcia's statement that she sometimes still smuggled people into the United States, (6) Garcia's statement that Ubaldo-Viezca was her boyfriend and business partner, even though she did not know his name,

17

(7) Garcia's inconsistent statements regarding who owned the trailer, and (8) the fact that Ubaldo-Viezca was a suspect in an ongoing narcotics investigation. *See Pruitt*, 174 F.3d at 1220 ("A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity. Among those factors . . . are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination").

In addition to the reasonable suspicion justification, Barnes was permitted to prolong the stop because it had become a consensual encounter. *See id.* While Barnes was waiting to hear from BLOC, he gave Garcia the warnings he had issued, and returned the vehicle title and Ubaldo-Viezca's and Garcia's licenses. After hearing from BLOC, Barnes asked Garcia for consent to search her vehicle, which Garcia granted. At this point, the stop transformed into a consensual encounter. *See id*. Accordingly, the district court did not err in finding that the duration of the stop was constitutionally permissible.

### iv. *District Court's Failure to Hold a Hearing*

Ubaldo-Viezca asserts in his appellate brief that the district court erred by "failing to conduct an independent hearing" in connection with his motion to suppress. However, he cites no case law and makes no arguments in support of this claim. Accordingly, we do not address this issue, because Ubaldo-Viezca has

18

abandoned it on appeal. *See United States v. Cunningham*, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that a defendant abandons an issue for which no argument is offered on appeal).

### B.    *Admission of Firearms*

We review a district court's ruling on a motion *in limine* for abuse of discretion. *United States v. Thompson*, 25 F.3d 1558, 1563 (11th Cir. 1994). We also review for abuse of discretion the district court's decision to admit or exclude evidence. *United States v. Smith*, 122 F.3d 1355, 1357 (11th Cir. 1997). The harmless error doctrine applies to evidentiary rulings. *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); Fed.R.Evid. 103(a); Fed.R.Crim.P. 52(a) (providing that, under the harmless error standard, "[a]ny error . . . that does not affect substantial rights must be disregarded"). We review the record *de novo* when conducting harmless error analysis. *Henderson*, 409 F.3d at 1301 n.4. "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error." *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999); *see United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000) (finding that admission of evidence in violation of Fed.R.Evid. 404(b) was harmless error because the evidence presented at trial was "substantial" and the defendant's rights were not affected).

19

The Federal Rules of Evidence provide that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

Fed.R.Evid. 404(b). "Rule 404(b) does not exclude evidence that is 'inextricably intertwined' with evidence of the charged offense" or "evidence that is 'linked in time and circumstances with the charged crime.'" *United States v. McNair*, 605 F.3d 1152, 1203 (11th Cir. 2010). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

The government does not assert that the firearms tended to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident. *See* Fed.R.Evid. 404(b). Instead, it appears to argue, and the district court appears to have found, that the firearms were "inextricably intertwined" or "linked in time and circumstances" to the charged offenses. Although we have recognized that firearms are "tools of the [drug] trade," *see United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990), there is no evidence that

20

the firearms found at Ubaldo-Viezca's home were used or possessed in connection with the charged offenses. Ubaldo-Viezca was charged only with respect to the fifth trip he and Garcia made to Mexico. At trial, although Garcia testified that she left the truck containing the cocaine at Ubaldo-Viezca's house after making the first four trips to Mexico, there was no evidence that the truck containing the cocaine was anywhere near Ubaldo-Viezca's house during the fifth trip. Furthermore, when Garcia and Ubaldo-Viezca were stopped in Alabama, no firearms were found in the vehicle or trailer, or on Ubaldo-Viezca's or Garcia's person. There was also no testimony that Ubaldo-Viezca was in possession of a firearm when he and Garcia crossed into the United States on the fifth trip. Thus, although the firearms found at Ubaldo-Viezca's home were linked in time to the charged offenses—since they were discovered the day after Ubaldo-Viezca was arrested—there is no evidence that they were linked in "circumstances" or "inextricably intertwined" with the charged offenses. *See McNair*, 605 F.3d at 1203.

The government relies on *United States v. Ramsdale*, 61 F.3d 825 (11th Cir. 1995), for the proposition that weapons are tools of the drug trade and, therefore, the weapons at Ubaldo-Viezca's home were properly admissible as circumstantial evidence that he was involved in drug trafficking. However, the weapons in

21

*Ramsdale* were found inside a vehicle that also contained methamphetamine. *See id.* at 829-30. Thus, unlike in the instant case, the firearms were linked both in time and circumstances to the underlying drug offense, because the defendant possessed the narcotics and the firearm simultaneously. Furthermore, the prejudicial effect of admitting such a large number of weapons, which included several assault rifles and grenade launchers, likely outweighed any limited probative value the firearms had. *See* Fed.R.Evid. 403.

Nevertheless, we affirm Ubaldo-Viezca's convictions under the harmless error doctrine, because the evidence presented at trial overwhelmingly demonstrated his guilt. *See* Fed.R.Evid. 103(a) (providing that an erroneous evidentiary ruling does not constitute reversible error unless the error affects a party's substantial rights); *Henderson*, 409 F.3d at 1300; *Guzman*, 167 F.3d at 1353. Specifically, the evidence showed that Ubaldo-Viezca was a passenger in a vehicle that was pulling a trailer containing eight kilograms of cocaine. Ubaldo-Viezca lied to officers, telling them that he was currently working as a confidential informant in connection with a DEA investigation. Before the cocaine was discovered, Ubaldo-Viezca admitted that eight kilograms of cocaine were hidden in the trailer's axles. According to Herman, Ubaldo-Viezca also admitted to being present in Garcia's vehicle when the trailer was brought into the United

22

States from Mexico. Herman testified that Garcia told him that she and Ubaldo-Viezca drove the trailer into Mexico on Saturday, June 23, 2007, and drove the trailer back into the United States the following Monday. These dates were corroborated by border crossing documents. Furthermore, Garcia testified that, during the fifth trip to Mexico, she watched Ubaldo-Viezca place the cocaine in the trailer. She specifically noted that Ubaldo-Viezca attached a rope to the packages. Barnes testified that straps were attached to the packages of cocaine when they were found inside the trailer. Accordingly, because the evidence against Ubaldo-Viezca was overwhelming, the admission of the firearms into evidence was harmless error. *See* Fed.R.Evid. 103(a); *Henderson*, 409 F.3d at 1300; *Guzman*, 167 F.3d at 1353.

### C. *Substantive Reasonableness of Sentence*

We may review a sentence for procedural or substantive reasonableness. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007). In considering the substantive reasonableness of a sentence, we consider the totality of the circumstances and apply an abuse of discretion standard, under which we reverse only if we find "that the district court has made a clear error of judgment." *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008). The party challenging the sentence "bears the burden of establishing that the sentence is

23

unreasonable in the light of both th[e] record and the factors in section 3553(a)."

*United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

The factors in § 3553(a) that the court must consider are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwa[rra]nted sentencing disparities; and (10) the need to provide restitution to victims.

*Id.* at 786 (citing 18 U.S.C. § 3553(a)).

"We may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence." *Pugh*, 515 F.3d at 1191. Normally, however, the decision of how much weight to accord particular factors in devising a sentence is within the discretion of the district court. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007).

Ubaldo-Viezca contends that the district court only considered his applicable guideline range in determining a reasonable sentence. This argument is belied by the record, as the district court specifically mentioned several § 3553(a) factors and stated that it had considered the § 3553(a) factors. Furthermore, the district court did not abuse its discretion in determining that the § 3553(a) factors warranted a

24

255-month sentence. Although Ubaldo-Viezca had no criminal history, Garcia testified that she and Ubaldo-Viezca had imported and delivered cocaine on four prior occasions. These additional trips, as well as the significant amount of cocaine involved and the multitude of weapons found at Ubaldo-Viezca's residence, indicate that a sentence in the middle of the applicable guideline range was warranted by the seriousness of the offense and the need to protect the public. *See* 18 U.S.C. § 3553(a)(2)(A), (C). In addition, the fact that Ubaldo-Viezca made multiple trips and failed to accept responsibility for his role in the offense indicates that a mid-range sentence was needed for deterrence purposes and to promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). Accordingly, the district court did not abuse its discretion in imposing a mid-range sentence, and we affirm Ubaldo-Viezca's convictions and 255-month sentence.

**AFFIRMED.**