[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12574

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 13, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00120-CR-3-MCR

UNITED STATES OF AMERICA,

                                                           Plaintiff-Appellee,

versus

CESAR OSVALDO LUNA-ENCINAS,

                                                           Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 13, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Cesar Osvaldo Luna-Encinas was convicted of being an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). He appeals the district court's denial of his motion to suppress pre-Miranda statements he made to a police officer that led to the discovery of the firearm. After thorough review, we affirm because Luna-Encinas was not in "custody" when he made the relevant inculpatory statements to the police.

I.

We recite the facts as found by the district court in its order denying Luna-Encinas' motion to suppress; indeed, Luna-Encinas concedes that all of the district court's findings were supported by substantial evidence. Those facts, as developed at a suppression hearing, are as follows.

At the time of his arrest on September 20, 2007, twenty-eight-year-old Luna-Encinas lived in Pensacola, Florida, with his girlfriend in a second-floor room of Wanda Caceres' townhouse at 3407A Hernandez Street ("Townhouse A"). In that room, Luna-Encinas stored a Sig Sauer .357 caliber pistol under the mattress. He kept an empty pistol box, also bearing the Sig Sauer label, in the bedroom closet. Law enforcement officers discovered the pistol box, and then the pistol, during the course of a narcotics investigation on September 20, 2007, and later discovered that Luna-Encinas could not legally possess the gun because he was not lawfully in

the United States. The officers, however, were not looking for Luna-Encinas or his gun when they arrived late that morning in the front yard of the neighboring townhouse at 3407B Hernandez Street ("Townhouse B").

Rather, earlier that day, at a local Federal Express office, City of Pensacola police officers had intercepted a package addressed to Townhouse B containing thirty pounds of marijuana. They quickly obtained a warrant to search Townhouse B from a state-court judge and planned to make a controlled delivery there. Later that morning, Pensacola Police Department detectives Marvin Miller and Eric Hubley, federal Drug Enforcement agent Keith Humphreys, and Florida Department of Law Enforcement agent Chris Webster began the controlled delivery of the package. Webster, posing as a Federal Express employee, arrived at Townhouse B to deliver the package, while the other officers remained nearby to monitor the operation. Miller, Hubley, and Humphreys were dressed in plain clothes but wore vests marked with police insignia.

As agent Webster neared the front of Townhouse B, several men were standing in the yard in front of Townhouse A. One of them, later identified as Alejandro Pulido-Govea, left the group and approached Webster. Pulido signed for and accepted the package, and then entered Townhouse B. Webster left the immediate vicinity, at which point the officers entered Townhouse B pursuant to

3

the search warrant. They located the unopened package in a closet but, unable to find Pulido, left the building to ask the neighbors about his whereabouts. A neighbor told the officers that she had seen someone leave the adjacent Townhouse B and enter Townhouse A. Hubley, along with a uniformed officer now on the scene, proceeded to the front door of Townhouse A, while Humphreys and another uniformed officer headed towards the back of the residence.

Entering the backyard of Townhouse A with their service weapons drawn but pointed downward, Humphreys and the uniformed officer found the defendant Luna-Encinas and another man identified as "Jose" doing yard work. Humphreys, who was the only Spanish-speaking officer on the scene, explained to the two men in Spanish -- and in a "serious" tone -- that the officers were looking for a specific person, but that Humphreys knew that neither of the men was that person. Humphreys inquired if there were any other males in Townhouse A and if anyone had run through the yard or into the residence. Luna-Encinas and Jose answered "no" to both questions. To make sure they were not armed, Humphreys then asked them to raise their shirts to reveal their waistbands, and they complied. Neither had a weapon. Humphreys directed Luna-Encinas and Jose to sit down until the residence had been secured, telling them that the investigation would not take long. Again, they complied, and for some ten minutes, the two officers, the defendant

4

Luna-Encinas, and Jose remained in the backyard making small talk as the investigation proceeded.

In the meantime, Miller and Hubley had approached the front of Townhouse A. The group of men previously standing in the front yard had dispersed. Miller knocked on the door, and, after several minutes, Wanda Caceres answered. Miller explained that a narcotics investigation was under way and asked if anyone had just come into the townhouse. According to the district court, it was not clear whether Caceres answered "yes" or "no," but she plainly did permit Miller and Hubley to enter the dwelling. They stood at the entryway of the home, which was near the foot of the stairs to the second floor. Caceres told Miller that several other people were upstairs; at Miller's request, Caceres asked them to come down. One of the men descending the stairs was identified as Pulido; he was arrested and placed in a squad car.

Miller then asked Caceres for consent to search her home, Townhouse A, which she granted. At about that time, Pensacola Police Department detective Miller, who was in the upstairs bedroom, spotted Luna-Encinas' closed Sig Sauer handgun box in the bedroom closet, which was empty except for a magazine and some bullets. A young woman downstairs was brought up to the bedroom; she told the officers that she lived in the room with her boyfriend (later determined to be

5

the defendant Luna-Encinas), but that she had no knowledge of the gun. Hubley radioed to the other officers that there might be a firearm on the scene and, as he left to retrieve written consent-to-search forms, instructed the uniformed officer in the backyard to bring the two men detained there to the front of the townhouse.

Several minutes later, while Caceras was signing a consent form, Humphreys and the other officer brought Luna-Encinas and Jose to the front yard of Townhouse A. At no point had the two men been handcuffed, and the officers, with their weapons holstered, walked behind them as they all traveled the thirty feet separating the backyard from the front of the house. The officers did not physically touch or otherwise restrain the defendant Luna-Encinas or Jose. When the four men arrived in the front yard, one of the officers told Luna-Encinas and Jose to sit on the ground. Luna-Encinas attempted to speak to Jose, but was told not to.

Soon afterward, Caceres exited the house and, without prompting, identified the defendant Luna-Encinas as the co-resident of the upstairs bedroom, where the firearm box and bullets had been found. Hubley then asked Luna-Encinas where the handgun was located, and Caceres translated Hubley's question. Luna-Encinas rose and approached Caceres, telling her that the gun was under the mattress in the front bedroom. Caceres translated this response into English, as apparently did

6

Humphreys almost simultaneously.

Hubley and Humphreys immediately went upstairs and retrieved the handgun from under the bedroom mattress. When they returned to the yard a few moments later, Humphreys advised the defendant Luna-Encinas of his Miranda rights in Spanish. From the time the officers first knocked on Caceres' door until the defendant made the admission about the location of the weapon, about fifteen minutes had elapsed; about five minutes had passed since Luna-Encinas had been brought to the front yard. After about ten more minutes, agent Craig Saier of the federal Bureau of Alcohol, Tobacco, and Firearms arrived on the scene and questioned Luna-Encinas further. Luna-Encinas admitted that he owned the firearm and that he was an illegal alien. He was then arrested.

Luna-Encinas was charged with being an illegal alien in possession of a firearm, in violation of Title 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). He moved to suppress his statements concerning the location of the firearm, and the firearm itself, claiming that they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). The government in turn argued that Luna-Encinas was not in "custody" for Miranda purposes at the time the officers questioned him about the firearm in the front yard of Townhouse A.

After holding an evidentiary hearing, the district court denied the motion to

suppress. The district court concluded that while the defendant had been "seized," he was not in "custody" for Fifth Amendment purposes. The district court explained that a reasonable person in Luna-Encinas' position -- i.e., one placed under the control of several law enforcement officers for a matter of fifteen minutes while a drug suspect was sought -- would not have understood his detention to be anything other than "temporary and brief," particularly given the officers' express assurances that he was not the person they were seeking, and the fact that they never pointed a weapon at him. These circumstances, the district court concluded, did not sufficiently resemble an arrest to constitute "custody."

On January 24, 2008, Luna-Encinas pled guilty, reserving the right to appeal the district court's suppression order pursuant to Fed. R. Crim. P. 11(a)(2). On April 24, 2008, the district court sentenced Luna-Encinas to eighteen months' imprisonment and three years' supervised release, noting that he would be deported at the end of his prison term. This timely appeal followed.

II.

In an appeal of the district court's denial of a defendant's motion to suppress, we review the district court's findings of fact for clear error and its application of the law to those facts de novo. United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000).

Luna-Encinas claims that his statements leading to discovery of the firearm, and the firearm itself, must be suppressed because he made the statements before being advised of his Miranda rights, and because the discovery of the gun was, effectively, the fruit of those statements. The Fifth Amendment provides to every person a right against self-incrimination, U.S. Const. amend. V, and, correspondingly, requires that trial courts exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel. The entitlement to this warning, however, attaches only "when custodial interrogation begins." United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004). Thus, Luna-Encinas was entitled to Miranda warnings only if he was in custody at the time he made the statements in question.

Luna-Encinas argues that because "a reasonable person in [his] position would not have felt free to leave or terminate the encounter[,] . . . Miranda [warnings] should have been read." Opening Br. at 6-7. And the government also frames the question as whether, "under the totality of the circumstances, a reasonable man in [Luna-Encinas'] position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave." Answering Br. at 12 (quoting United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001)). We previously have explained, however, that although a reasonable person

9

in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been "seized" by law enforcement -- he will not necessarily be considered in "custody" for Fifth Amendment purposes. United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006).

Rather, "a free-to-leave inquiry reveals only whether the person questioned was seized." United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004) (emphasis added). While "seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. (emphasis added); see also United States v. Phillips, 812 F.2d 1355, 1359 (11th Cir. 1987) ("[T]he ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).

In assessing whether a reasonable innocent person in Luna-Encinas' position "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest," Newton, 369 F.3d at 672,[1] we consider the totality

_____

[1] "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)); see

10

of the circumstances, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," Street, 472 F.3d at 1309 (citation and quotation marks omitted), as well as the location and length of the detention, see, e.g., United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006) (location); United States v. Medina-Villa, 567 F.3d 507, 519 (9th Cir. 2009) (duration). Doing so here, we cannot say that Luna-Encinas was in "custody."

We begin with the encounter in the backyard of Townhouse A. Luna-Encinas was not physically touched by the officers, he was neither threatened nor intimidated verbally or physically, and a weapon was never pointed or directed at him. Indeed, while the officers who first encountered Luna-Encinas had their weapons drawn as they entered the backyard, the weapons were pointed downward in a protective posture and were holstered shortly after the initial arrival. Further, although the officers told Luna-Encinas to sit down while the house was being secured, they assured him that this would not take long, and they expressly stated at the outset that Luna-Encinas was not a suspect. That some of their words were spoken in a "serious" tone does not render the situation materially closer to an arrest, and we think that Luna-Encinas plainly was not in custody at this point.

---

also Florida v. Bostick, 501 U.S. 429, 437-38 (1991).

11

About ten minutes later, the officers escorted Luna-Encinas and Jose to the front of Townhouse A, where they were again directed to sit down and, this time, told not to speak. Based on Caceres' spontaneous observation that Luna-Encinas occupied the bedroom where the handgun box and some bullets had been found, detective Hubley then asked Luna-Encinas, in English, about the firearm. Caceres translated the question, Luna-Encinas responded that the firearm was in the bedroom under the mattress, and Caceres translated the answer for the officers. During the encounter, which lasted some five minutes, no one touched Luna-Encinas or intimidated him verbally or physically. "No handcuffs were employed, and no guns were drawn." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (concluding that defendant was not in custody, and citing United States v. Blackman, 66 F.3d 1572, 1576-77 & n.4 (11th Cir. 1995), for the proposition that even handcuffing and holding a suspect at gunpoint would not necessarily constitute custody). Moreover, Luna-Encinas was on familiar ground in his own front yard. As we explained in Brown, we are much "less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." 441 F.3d at 1348 (quotation marks, citation, and emphasis omitted). And Luna-Encinas' detention in the front yard lasted a mere five minutes. See Medina-Villa, 567 F.3d at 519. Finally, Luna-

12

Encinas at no point asked to leave the premises, nor informed the officers that he did not wish to comply with any of their requests. See Phillips, 812 F.2d at 1362 (concluding that defendant was not in custody because, inter alia, he "never requested a lawyer or to terminate the interview").

In short, this record convinces us that Luna-Encinas was detained for a relatively brief period in a neutral, outdoor location, while other officers searched for a drug suspect who, as they had told Luna-Encinas, was not him. Even accepting that Luna-Encinas had been "seized" as he sat on the ground in the front yard of his home, we are convinced that a reasonable person in his position would not have "understood his freedom of action to have been curtailed to a degree associated with formal arrest." Newton, 369 F.3d at 672. Luna-Encinas' very brief detention

> did not involve the type of 'highly intrusive' coercive atmosphere that may require Miranda warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in [Luna-Encinas'] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No Miranda warnings were required at the time.

Acosta, 363 F.3d at 1150. Because Luna-Encinas was not in "custody" when he made the statements leading to the discovery of the firearm, the officers were under no obligation to advise him of his Miranda rights, and no Fifth Amendment

13

violation occurred. Thus, the district court properly denied Luna-Encinas' motion to suppress both his pre-arrest statements and the firearm itself.[2]

Accordingly, we AFFIRM the district court's order denying Luna-Encinas' motion to suppress.

---

[2] As it did in the district court, the government has argued on appeal that the public safety exception to <u>Miranda</u> also applied -- the claim being that the officers acted under a pressing exigency to find the gun and to prevent it from being used against any of the numerous persons on the scene. <u>See</u> <u>United States v. Spoerke</u>, 568 F.3d 1236, 1249 (11th Cir. 2009). Since we conclude that Luna-Encinas was not in custody and therefore not entitled to a <u>Miranda</u> warning, we do not consider whether the public safety exception to <u>Miranda</u> would have applied.