[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15972
Non-Argument Calendar
_____

D.C. Docket No. 2:16-cr-00003-LSC-SGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT LELAND GRANT, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(May 19, 2017)

Before MARTIN, FAY and ANDERSON, Circuit Judges.

PER CURIAM:

Robert Leland Grant, Jr. appeals his conviction for receiving child pornography and his restitution order, following his guilty plea. We affirm.

## I. BACKGROUND

In 2013, Grant, a teacher at John Carroll Catholic High School ("John Carroll"), and a minor student, MC,[1] started having sexual contact. Their relationship primarily occurred in the summer of 2013, when MC was 17 years old. Grant and MC frequently text messaged and met outside of school on a number of occasions and would go for drives together. On these drives, they would hold hands and kiss; there also were instances where Grant touched MC on her breasts and genitals. Sexually explicit videos and images were exchanged by text.

Grant started sending MC pictures of himself in March 2013, when MC was 16 years old, but she did not receive any nude pictures of him until the summer of 2013, when she was 17 years old. Grant sent approximately ten nude images and three or four nude videos of himself to MC. MC sent three or four nude pictures and one nude video of herself to Grant during the summer of 2013. She took the nude photos and video using her cellular phone and sent the photos to Grant by text message.

On February 12, 2014, the Jefferson County Sherriff's Office received a report Grant may have had inappropriate relationships with minor students at John

---

[1] MC, also referred to in the record as MC1 and MC#1, was born in 1996.

2

Carroll. The next day, Grant met with Charles McGrath, the principal of John

Carroll, and Michael Callahan, a retired law enforcement officer, to discuss the

allegations. Grant provided a signed, notarized statement to Callahan and admitted

to text-message exchanges with MC that involved sharing sexually explicit photos

and videos. Grant gave Callahan his cellular phone during the meeting. Principal

McGrath and Callahan then gave the cellular phone and a copy of Grant's

statement to Sergeant Michael House.

On February 19, 2014, Grant met with Sergeant House at the Sherriff's

Office. Sergeant House informed Grant he was not under arrest and could leave at

any time. Sergeant House read Grant his *Miranda*[2] rights; Grant orally confirmed

he understood. Grant then signed a *Miranda* waiver, showing he understood his

rights and confirming no one had forced, threatened, or promised him anything in

exchange for the waiver. Grant again admitted to having a relationship with MC

between June 2013 and February 2014 and having received nude pictures of

female students as young as 16 years old on his cellular phone. Grant discussed

his meeting with Principal McGrath and Callahan and stated he voluntarily gave

his cellular phone to Callahan. Grant assumed Callahan had given the cellular

phone to law enforcement to conduct a forensic analysis; Grant confirmed law

enforcement could perform a forensic analysis and gave Sergeant House the access

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

code.  Grant told Sergeant House he was trying to get a replacement cellular phone.  He also told Sergeant House he would try to bring in his wife's cellular phone, which previously had belonged to him.

Grant signed a written form consenting to the search of his and his wife's cellular phones.  The forms advised Grant he could revoke his consent at any time.  Grant told Sergeant House that Principal McGrath and Callahan had stated his cooperation could work in his favor and asked whether this was true.  Sergeant House told Grant he could not promise anything but would make Grant's cooperation known.  The next day, Grant delivered his wife's cellular phone to the Sheriff's Office and signed another form consenting to the search of the device.  On March 10, 2014, law enforcement obtained a state warrant to search Grant's cellular phone.  The warrant was returned on May 12, 2015.[3]

In January 2016, Grant was charged with two counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a) and (e) (Counts 1 and 2), and one count of receiving child pornography, in violation of 18 U.S.C. § 2252A(a)(2) (Count 3).  Grant filed a motion to suppress evidence arising from the state-issued search warrant supporting the analysis of Grant's cellular phone and the fruits of that search, including Grant's statements.  He argued the warrant was void,

---

[3] Although the execution date was identified as April 15, 2014, the government, during the hearing on the suppression motion, stated new evidence showed the warrant was executed on March 10, 2014.

4

because it was not executed within the ten days prescribed by state law. He also contended the search was unreasonable, because law enforcement failed to file a return of the warrant within a reasonable time. He argued the delay in returning his cellular phone unreasonably infringed on his possessory interest. Grant also contended his statements were involuntary, and he did not consent voluntarily to the search of his cellular phone.

A magistrate judge conducted a hearing on the motion to suppress. The government introduced a video recording of Grant's interview with Sergeant House. Sergeant House and Grant also testified at the hearing. Sergeant House testified he did not induce Grant in any way by threatening or telling him to consent, making any promises, or otherwise convincing Grant to consent. Sergeant House told Grant he could not promise anything in exchange for consent. Grant never asked Sergeant House for his cellular phones to be returned, revoked his consent, or placed any limits on his consent. Although Sergeant House testified he could not recall having any communication with Principal McGrath and Callahan prior to their interview with Grant, he did speak with them when they turned over the cellular phone and Grant's written statement.

Grant testified he respected Principal McGrath. During his meeting with Principal McGrath and Callahan, they talked extensively about Catholicism, sins, confession, and forgiveness to encourage Grant to make a statement. Callahan told

5

Grant judges often show leniency to people who cooperate in criminal investigations; Grant therefore assumed it was in his best interest to cooperate. Grant testified, but for the declarations about his faith and leniency, he would not have made a statement or handed over his cellular phone; he would have gotten an attorney immediately. Grant was not *Mirandized* before speaking with Principal McGrath and Callahan but did receive his *Miranda* warnings from Sergeant House. Grant verified the signature on the consent forms was his signature. Grant stated Sergeant House made no promises to him; he told Sergeant House he understood no promises were made. Throughout his interview with Sergeant House, Grant stated he still was reflecting on what Principal McGrath and Callahan had said to him, and it had weighed on him because he already had given a full confession to them.

The magistrate judge wrote a Report and Recommendation ("R&R") establishing the facts based on the testimony of Sergeant House and Grant and the video recording of their February 2014 meeting. The judge recommended a denial of the motion to suppress statements and evidence. The judge concluded Grant's consent to search his cellular phone was voluntary, because he told Callahan he assumed he would give it to law enforcement, he executed written-consent forms, he was aware of his ability to revoke his consent but elected not to do so, and he told Sergeant House of his intent to obtain a replacement cellular phone.

6

The magistrate judge also concluded Grant, a high school teacher, understood Sergeant House did not make any promises to him in order to induce him to make a statement; Callahan also did not promise or otherwise coerce Grant. Grant's conversation with Principal McGrath and Callahan was incident to Grant's employment. The judge stated Sergeant House's credible testimony supported the finding he did not use Principal McGrath and Callahan to extract evidence unlawfully from Grant, because he could not recall ever having a conversation with them prior to their meeting with Grant or instructing them to talk to Grant; they had an independent reason to question Grant, because Grant's actions involved a student at their school. The judge noted Grant had made statements only to Sergeant House after he waived his *Miranda* rights; the statements he made to Principal McGrath and Callahan, because they are private actors, do not implicate Grant's constitutional rights. The magistrate judge did not reach the issue of the validity of the warrant, because Grant made knowing and voluntary statements and voluntarily consented to the search of his cellular phones.

The district judge adopted the R&R in its entirety and overruled Grant's objections. Grant subsequently signed a plea agreement. He agreed to plead guilty to Count Three, receiving child pornography in violation of § 2252A(a)(2); the government agreed to dismiss Counts One and Two. Grant agreed "to pay restitution as determined by the court," and he waived his right to appeal his

"conviction and/or sentence . . . as well as any fines, restitution, and forfeiture orders that the Court might impose." Am. Plea Agreement at 1, 9 (Apr. 27, 2016). Grant expressly reserved his right to appeal the denial of his motion to suppress. The judge sentenced Grant to 60 months of imprisonment and ordered $8,341.25 in restitution to cover MC's legal fees. Grant appeals the order denying the motion to dismiss and his restitution order for MC's legal fees.

## II. DISCUSSION

### A. Motion to Suppress

On appeal, Grant argues the district judge erred in denying his motion to suppress the evidence obtained from the search of his cellular phone and the statements he made to the police and private actors. He argues he did not make voluntary statements and did not consent to search of his cellular phones; even if he did, the search warrant obtained was not validly executed. A district judge's ruling on a motion to suppress presents a mixed question of law and fact. *United States v. Timmann*, 741 F.3d 1170, 1177 (11th Cir. 2013). We review a district judge's factual findings for clear error and the judge's application of the law to the facts de novo. *Id.* We accord deference to a district judge in reaching credibility determinations with respect to witness testimony. *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003).

8

**1. Consent**

We review voluntariness of consent to search for clear error. *United States v. Zapata*, 180 F.3d 1237, 1240-41 (11th Cir. 1999). Under the Fourth and Fourteenth Amendments, "a search conducted without a warrant issued upon probable cause is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (citation, internal quotation marks, and ellipsis omitted). One exception is a search "conducted pursuant to voluntary consent." *Id.* Consent is voluntary if it is "the product of an essentially free and unconstrained choice." *Id.* A mere indication a defendant's cooperation could be helpful does not render the defendant's consent to search involuntary. *See United States v. Vera*, 701 F.2d 1349, 1364-65 (11th Cir. 1983).

"The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citation and internal quotation marks omitted). "A district court's determination that consent was voluntary is a finding of fact, that will not be disturbed on appeal absent clear error." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001). We must consider the totality of the circumstances, when determining "whether there were any

9

limitations placed on the consent given and whether the search conformed to those limitations." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).

Grant voluntarily consented to the search of his cellular phone. He gave his cellular phone to Callahan with the understanding he would turn the phone over to the police, he voluntarily signed a consent form for the forensic search of his cellular phone after waiving his *Miranda* rights, he gave Sergeant House the password to his cellular phone, and he returned to the police station the following day to deliver his wife's cellular phone. While Grant signed consent forms notifying him he could revoke or limit his consent, he never did. *See Blake*, 888 F.2d at 798. He also did not ask Sergeant House to return his cellular phone. Neither Sergeant House, Principal McGrath, nor Callahan coerced Grant into consenting to the search. Any statement Principal McGrath or Callahan made that cooperation could help Gant did not render his consent involuntary. *See Vera*, 701 F.2d at 1365-65. While Principal McGrath and Callahan spoke about leniency for cooperation, they were private actors and were not in a position to make promises about his prosecution.[4] A review of the totality of the circumstances shows Grant's consent was "essentially [a] free and unconstrained choice." *Garcia*, 890 F.2d at 360. The judge did not clearly err in finding Grant voluntarily consented,

---

[4] *See United States v. Jacobsen*, 466 U.S. 109, 113-14, 104 S. Ct. 1652, 1656-57 (1984) (holding the Fourth Amendment restrains only the government, not private actors).

10

orally and in writing, to the search of his cellular phones.[5] *See Zapata*, 180 F.3d at 1240-41.

## 2. Statements

The Fifth Amendment right against self-incrimination and the Fourteenth Amendment guarantee of due process require an incriminating statement to the government be voluntary. *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). "[C]oercive police activity is a necessary predicate to finding that a confession was not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 522 (1986). The totality of the circumstances determines whether an incriminating statement is voluntary. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010).

In *Miranda*, the Supreme Court held "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). Custodial interrogation occurs "after a person has been taken into custody or otherwise deprived of his freedom of action

---

[5] While Grant argues any prior consent does not survive the issuance of a search warrant and the validity of the warrant alone controls the legality of the search, this argument fails, because we affirm on other grounds. *See United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010) (recognizing we affirm the denial of a motion to suppress on any ground supported by the record).

11

in any significant way." *Id.* Whether a suspect is in custody is an objective inquiry that goes beyond whether a reasonable person would have felt free to leave. *United States v. Luna-Encinas*, 603 F.3d 876, 881 & n.1 (11th Cir. 2010). The proper question is whether "a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*." *Id.* at 881 (citation and internal quotation marks omitted). In determining whether a suspect was in custody, we consider the totality of the circumstances. *Id.* We are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Id.* at 882 (citation and internal quotation marks omitted).

Grant's statements to Sergeant House were voluntary and subject to the procedural safeguards contemplated by *Miranda*. *See Lall*, 607 F.3d at 1285. At the motion hearing, Sergeant House and Grant testified Grant was read his *Miranda* rights prior to making any statements, and he signed a waiver. Sergeant House further testified he did not induce Grant in any way by making promises to convince him to consent; instead, he told Grant he could not make any promises. Grant also confirmed Sergeant House did not make him any promises. Grant does not argue, nor do the facts suggest, he felt his freedom of action was curtailed. *See Luna-Encinas*, 603 F.3d at 881. He was not in custody at the time he made statements to Sergeant House, who had told him he was not under arrest, and he

12

was free to leave at any time.  Grant left at the conclusion of the interview and voluntarily returned the following day with the second cellular phone.

The magistrate judge concluded Grant's confession to Principle McGrath and Callahan did not implicate his Fifth Amendment privilege, because she credited Sergeant House's testimony he had not spoken with Principal McGrath and Callahan prior to their interview with Grant, asked them to interview Grant, or directed them on how to interview him.  Grant, a high school teacher, was interviewed at the school, a familiar setting, and Grant did not testify Principal McGrath and Callahan forced or required him to stay put and answer questions. *See Luna-Encinas*, 603 F.3d at 882.  Grant's interview by private actors at the high school where he worked did not impinge on his Fifth Amendment right.  *See Connelly*, 479 U.S. at 166, 107 S. Ct. 521 ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.").  Because Grant made knowing and voluntary statements to private actors, Principal McGrath and Callahan, and he waived his *Miranda* rights before making a voluntary statement to Sergeant House, the judge did not err in finding, under a totality of the circumstances, Grant's statements were voluntarily and knowingly made.  *See Bernal-Benitez*, 594 F.3d at 1319.

## B. Restitution Order

Grant argues the district judge erred in requiring him to pay restitution for MC's legal expenses, because his conviction for receipt of child pornography was not the "proximate cause" of the expenses and the government did not provide a rationale for why MC required counsel.  Br. of Appellant at 15.  The government argues Grant's appeal waiver expressly includes a provision about waiving his right to appeal a restitution order.  The government requests this issue be summarily dismissed or, alternatively, denied on the merits, because attorney's fees are expressly included under 18 U.S.C. § 2259(b).

### 1. Appeal Waiver

"We review the validity of a sentence-appeal waiver de novo."  *United States v. Johnson*, 541 F.3d 1064, 1066 (11th Cir. 2008).  A sentence-appeal waiver will be enforced if it was made knowingly and voluntarily.  *United States v. Bushert*, 997 F.2d 1343, 1350 (11th Cir. 1993).  To establish the waiver was made knowingly and voluntarily, the government must show either (1) the district judge specifically questioned the defendant about the waiver during the plea colloquy, or (2) the record makes clear the defendant otherwise understood the full significance of the waiver.  *Id.* at 1351.  A district judge's "generalization that the defendant could appeal his sentence under some circumstances" has been found to be insufficient.  *Id.* at 1353.

14

The judge expressly found Grant understood the consequences of his plea agreement. Although the judge did not explain the waiver terms to Grant, he generally did confirm Grant understood the appeal waiver. The judge, however, did not provide a sufficient explanation of the appeal waiver during Grant's plea colloquy. *See id.* at 1352-53. While the judge specifically questioned Grant about signing the sentence-appeal waiver, his explanation was brief and vague, asking only whether Grant had understood by signing the waiver he had given up his right to appeal except in the limited number of circumstances explicitly set forth in the plea agreement. The judge also specifically did not mention Grant had waived his right to appeal a restitution order or state what expenses would be included in a restitution order. Because the judge did not fully apprise Grant of the scope of his sentence-appeal waiver in order to satisfy the first prong of *Bushert*, we will review the merits of Grant's arguments. *See id.*

## 2. Restitution for Victim's Legal Fees

We review for plain error if the defendant raises an issue for the first time on appeal. *United States v. Olano*, 507 U.S. 725, 731-32, 113 S. Ct. 1770, 1776 (1993). When analyzing a claim under the plain-error standard, this court will look to see (1) whether the district judge committed error, (2) that is plain, and (3) that affects substantial rights, but only if (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States v. Lejarde-*

15

*Rada*, 319 F.3d 1288, 1290 (11th Cir. 2003).  Plain error cannot be established where the explicit language of a statute or rule does not resolve an issue and there is no precedent from the Supreme Court or our court directly resolving it.  *Id.* at 1291.

Chapter 110 of Title 18 of the United States Code involves crimes related to the sexual exploitation and other abuse of children, including 18 U.S.C. § 2252A(a)(2), receipt of child pornography.  *See* 18 U.S.C. §§ 2251-2260a.  It requires the district judge to order restitution for any offense in the chapter, for "the full amount of the victim's losses."  *See* 18 U.S.C. § 2259(a), (b)(1), (b)(4)(A).  The victim's losses, as determined by the judge, "include any costs incurred by the victim for— (E) attorney's fees, as well as other costs incurred." § 2259(b)(3).  Victim is defined as "the individual harmed as a result of a commission of a crime under this chapter, including, in the case of a victim who is under 18 years of age, . . . the legal guardian of the victim."  § 2259(c).

In applying § 2259, the Supreme Court held the government must prove the defendant's conduct was the proximate cause of the victim's losses in order to impose a restitution order for those losses.  *Paroline v. United States*, __ U.S. __, __, 134 S. Ct. 1710, 1722 (2014).  The Court reasoned the first five categories of § 2259(b)(3), including the provision identifying attorney's fees, give "guidance to district courts as to the specific types of losses Congress thought would often be

16

the proximate result of a Chapter 110 offense and could as a general matter be included in an award of restitution." *Id.* at 1721.  Section 2259 clearly states, for a crime under the chapter, the district judge *must* order restitution for the full amount of the victim's losses, including attorneys' fees.  *See* 18 U.S.C. § 2259(a), (b). *Paroline* identified attorney's fees as a loss specifically contemplated by Congress that would be "the proximate result of a Chapter 110 offense."  134 S. Ct. at 1721.

MC, the victim, went to an attorney after her relationship with Grant was discovered in order to determine what legal remedies were available.  The district judge found the attorneys were present during the victim's interviews, demonstrating the fees were proximately caused by Grant's crime.  *Paroline* confirms Congress contemplated attorney's fees to be the proximate result of a conviction under Chapter 110, which includes § 2252A(a)(2).  Because the explicit language of a statute and Supreme Court case law have resolved restitution under § 2259 may include attorney's fees, and Grant had failed to object at the close of the hearing to the calculation of the fees, the district judge did not plainly err in awarding restitution for the victim's legal fees.  *See Olano*, 507 U.S. at 731-32, 113 S. Ct. at 1776; *Lejarde-Rada*, 319 F.3d at 1291.

**AFFIRMED.**

17