PAUL G. BYRON, UNITED STATES DISTRICT JUDGE
This cause is before the Court on Defendant Noor Salman's Motion to Suppress certain statements made to law enforcement officers on June 12, 2016. (Doc. 107). The Government has filed their Response in Opposition, (Doc. 115), and the Defendant submitted a Reply. (Doc. 132). On December 21, 2016, the Court held an evidentiary hearing on Defendant's Motion to Suppress.[1] (Doc. 163). Upon due consideration *1328 of the parties' written submissions and the evidence presented at the evidentiary hearing, the Defendant's Motion to Suppress is DENIED.
I. BACKGROUND
On January 12, 2017, a grand jury sitting in Orlando, Florida, returned a two-count Indictment against Defendant, Noor Salman. (Doc. 1). Count I charges Defendant with aiding and abetting the attempted provision and provision of material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and (a)(2). (Id. ). Count II charges Defendant with obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). (Id. ). The Indictment alleges that Defendant aided and abetted her husband, Omar Mateen, in his attempt to provide material support or resources to the Islamic State of Iraq and the Levant (hereinafter referred to as "ISIL" or the "Islamic State"), culminating in the mass murder of forty-nine civilians and the injury of fifty-three civilians at the Pulse nightclub in Orlando, Florida, on June 12, 2016. (Id. ).
During the early morning hours of June 12, 2016, while authorities were actively investigating the Pulse nightclub attack by Mr. Mateen, the Fort Pierce Police Department made contact with Defendant Salman at her residence, after which her home and vehicle were secured pending the issuance of search warrants. Ms. Salman made a number of statements to the police at the scene, and she later accompanied special agents of the Federal Bureau of Investigation ("FBI") to a local field office where she continued to be interviewed. The Defendant now seeks the exclusion of her statements to local and federal law enforcement officers.
II. THE ISSUES PRESENTED IN DEFENDANT's MOTION TO SUPPRESS
Defendant Salman asserts the following grounds in support of her motion to suppress her statements:
1. The Defendant was unlawfully seized in violation of the Fourth Amendment of the United States Constitution when the officers directed her to sit inside of a patrol car to await the arrival of an FBI special agent.[2] (Doc. 107, p. 20; Doc. 186, 22:22-24);
2. The FBI's questioning of Defendant Salman while she was seated in the backseat of a patrol car, (Doc. 107, p. 7), and at the Fort Pierce FBI office was custodial and required law enforcement to advise the Defendant of her Miranda rights (Id. at p. 10);
3. The Miranda rights warning provided by SA Enriquez in the absence of "cleansing warnings" was insufficient to cure the taint of her previous un-Mirandized statements (Id. at p. 13); and
4. Defendant Salman's statements to the FBI after Miranda warnings were given were involuntary within the meaning of the Fifth Amendment due process clause. (Id. at p. 16).
*1329 The Court will address the facts relevant to each issue presented in the Defendant's motion that were adduced during the suppression hearing, followed by a discussion of the controlling legal principles.
III. STATEMENT OF PERTINENT FACTS
A. The Patrol Car
Lieutenant ("LT") William Hall is in charge of the Fort Pierce Police Department Criminal Investigations Division. (Doc. 184, 19:25-20:3). At approximately 3:13 a.m., he was dispatched to the apartment where Defendant Salman and Omar Mateen resided along with their child. (Id. at 21:6-14). The on-going investigation caused law enforcement to be concerned that explosives and booby traps may be present within the apartment. (Id. at 21:16-21). Upon arrival at the apartment complex, LT Hall called Defendant Salman's phone number and asked if she would come outside to speak with him, to which she agreed. (Id. at 25:1-5).
While LT Hall was armed with a rifle when he called the Defendant, the weapon had been secured by another officer in the trunk of the patrol car before he made contact with Defendant Salman outside of her apartment. (Id. at 26:14-25). LT Hall explained to Ms. Salman that "there was a situation that somebody in Orlando needed to talk to her." (Id. at 27:5-7). Defendant Salman allowed LT Hall to enter her apartment to ensure nobody other than her child was inside. (Id. at 27:7-10). LT Hall looked in the apartment and was satisfied no explosives or threatening individuals were present, and allowed Defendant Salman, who had been waiting in the hall, to go unaccompanied into her bedroom to change her clothing. (Id. at 28:1-15).
After she changed her clothing, Defendant Salman asked LT Hall if she needed her cell phone, and he told her she would not need it and asked if she would leave it on her table which she did. (Id. at 28:22-24). Defendant Salman picked up her son and carried him outside of the apartment.[3] (Id. at 29:1). Since it was June, the weather was hot and muggy, so LT Hall told Defendant Salman that she and her son could sit in the back of his patrol car which was running and had air conditioning. (Id. at 29:1-5). His patrol car was parked "almost to the hallway in the parking lot" near the Defendant's residence. (Id. at 29:11-14). LT Hall's vehicle is a "plain white Crown Victoria, no divider in it... [and] it had a regular back seat" (Id. at 30:14-17). That is, his vehicle was not marked and lacked the Plexiglas divider commonly present in marked units. (Id. at 31:2-3). None of the patrol cars had their emergency lights flashing. (Id. at 59:18-23). Only one other patrol car was parked in the parking lot, with the remaining vehicles parked closer to the complex entrance. (Id. at 59:24-60:10).
Defendant Salman sat on the driver side of the vehicle in the back seat, and her son was laying down in the back seat. (Id. at 30:23-31:1). The door to the back seat where Defendant Salman was seated was open, and she was not restrained. (Id. at 30:2-4, 20-22). While Defendant Salman and her son were seated in the vehicle, LT Hall and Officer Trinidad were standing about ten (10) feet away from the vehicle. (Id. at 31:4-10). LT Hall did not search Defendant Salman before she sat in the patrol car. (Id. at 48:20-24).[4] At one point that morning, Defendant Salman's son needed to go to the bathroom, and the *1330 officers suggested to the Defendant that her son could relieve himself near a large dumpster. (Id. at 32:16-25). Defendant Salman exited the patrol car and took her son to the dumpster to urinate. (Id. at 32:24-33:3).
LT Hall testified that Defendant Salman did not ask her to call anyone on her behalf while she was waiting for the FBI agent to arrive. (Id. at 53:9-13). When Defendant Salman asked how long she needed to wait, LT Hall told her it would be a while because people were on their way from Orlando. (Id. at 57:12-18). Prior to the FBI arriving, LT Hall limited his discussions with the Defendant to asking her to describe the type of car her husband had left home in, to which she replied that it was a rental car. (Id. at 31:11-20).
At approximately 5:45 a.m., FBI Special Agent ("SA") Christopher Mayo arrived at the apartment complex. (Id. at 113:21-24). Upon arrival, SA Mayo spoke with LT Hall who advised that Defendant Salman was sitting in his vehicle and further reported that he "hadn't really asked her any questions," but she had volunteered that her husband was very safe with guns. (Id. at 115:18-116:2). When SA Mayo approached Defendant Salman, he observed that "she was sitting with her legs facing out and her feet on the ground." (Id. at 116:10-12). She was not handcuffed or restrained in any way. (Id. at 116:16-17). SA Mayo's firearm was concealed from view during his interactions with Defendant Salman. (Id. at 117:1-9). SA Mayo identified himself to Ms. Salman and obtained biographical data from her. (Id. at 117:12-15). He asked Defendant Salman if she knew the whereabouts of her husband, and Defendant Salman stated that Mateen left the previous night at 5:00 p.m. to have dinner with a friend named "Nemo." (Id. at 118:20-24). The Defendant volunteered that they had just purchased airline tickets, and never asked SA Mayo why he was speaking with her and did not inquire about her husband's health or well-being. (Id. at 119:15-24).
SA Mayo asked Defendant Salman if Mateen had any ill will towards the United States, and she said he liked everyone, even homosexuals because they are sympathetic to Muslims. (Id. at 120:4-14). Defendant Salman's demeanor during this exchange was very calm as was his, and SA Mayo described it as a normal conversation. (Id. at 120:15-19). SA Mayo presented Defendant Salman with a written form used to obtain consent to search her apartment, and she stated that at "that point in time she ... did not want us looking through her apartment," and she declined to give consent to search. (Id. at 121:13-21). SA Mayo knew her apartment had been secured by law enforcement pending issuance of a search warrant, and he explained to Defendant Salman that his office was approximately five minutes away and asked if she would be willing to go to the office to continue talking. (Id. at 122:7-16). Defendant Salman agreed to go to his office, and SA Mayo discontinued his conversations with her while they waited for another agent to arrive. (Id. at 123:13-16). SA Mayo's conversation with Defendant Salman lasted about 15-20 minutes.[5] (Id. at 123:11-15). Prior to leaving for the FBI Office, Defendant Salman never asked SA Mayo if she could leave, nor did she request to be taken anywhere else. (Id. at 123:25-124:2).
Defendant Salman provided a sworn declaration in support of her motion to suppress wherein she describes this encounter with LT Hall and SA Mayo in very different terms:
*1331 On June 12, 2016, at or around 4:35 a.m., I received a call from the police demanding that I come out of my apartment with my hands up. When I opened the door, there were police officers standing outside with their guns drawn and pointed at me. The officers ordered me out of my house. In response, I told them I didn't want to come out because I wasn't dressed and my son was sleeping alone in the house. One of the officers holstered his gun, came forward, and told me I could go back in and change and get my son. The officer accompanied me into the house and stood outside my bedroom while I changed into a hoodie and jeans. After I changed, I came back into the living room and got my son... (Doc. 107-1, ¶ 4).
We went down to a police car and I was told to get in with my son. After a few minutes, a police woman came to the car and she directed me to step outside the car and place my hands on the car while she searched me. I was then told to get back in the car with my son. (Id. ¶ 5).
...
After about an hour, a man who identified himself as an F.B.I. agent came to the car and started questioning me about Omar's whereabouts. I asked him what was going on and was told that Omar had been involved in an incident at a club... After about an hour of questioning, the F.B.I. told me that I needed to come with them while they figured out what to do about a warrant. The F.B.I. then put my son and I in the back seat of a car and a male and female agent drove us to their office. (Id. ¶¶ 7-8).
The Court had the opportunity to observe LT Hall and various FBI Special Agents when they provided their testimony and responded to questions on cross-examination. By contrast, Defendant Salman elected not to testify at the suppression hearing, and the Court is limited to the Defendant's affidavit. The Defendant describes a coercive environment where she is ordered out of her home over objection with her hands up, is guarded by armed police with drawn guns, and is directed to sit in LT Hall's car after which she is interrogated and compelled to go to the FBI office. By contrast, LT Hall and Special Agent Mayo describe a cooperative environment where the Defendant agrees to speak with police who have discretely placed their weapons out of view, invites officers to conduct a safety sweep of her home, and willingly waits in the back of LT Hall's air conditioned vehicle, unrestrained and free to enter or exit at will, until the officer from Orlando arrived. SA Mayo's testimony that Defendant Salman declined to sign the consent to search form presented to her on the scene corroborates LT Hall's description of a non-coercive atmosphere. Similarly, SA Mayo testified that Defendant Salman agreed to travel to the Fort Pierce FBI Office to continue their discussion. The Court finds the testimony of LT Hall and SA Mayo to be credible.
B. The FBI Office
SA Mayo and SA Kristine Goetz drove Defendant Salman and her son to the FBI Office in SA Mayo's Ford Expedition. (Id. at p. 124:7-13). The Expedition does not have a cage or divider, no weapons were visible, and Defendant Salman was not restrained.[6] (Id. at p. 124:14-20). During the 7-minute drive, SA Mayo asked Defendant Salman if she and her son would like some food, and she indicated they would like food from McDonalds which was provided.
*1332 (Id. at 125:9-18). The interview at the FBI Office took place in a large conference room.[7] (Id. at 125:4-8). During Defendant Salman's interview, the door to the conference room remained open. (Id. at p. 127:25-128:5). The Defendant's son was free to run around the conference room and to draw on paper that had been provided to him. (Id. at 128:17-23). SA Kristine Goetz remained in the room with SA Mayo and Defendant Salman. (Id. at 128:24-129:1).
SA Mayo and SA Goetz began speaking with Defendant Salman at approximately 7:35 a.m. (Id. at 131:13-21). The discussion concerned biographical data and an incident in 2013 when Mateen was interviewed by the FBI. (Id. at 132:12-24). Defendant Salman said Mateen did not harbor any feelings towards law enforcement and had applied twice to become a police officer. (Id. ). The conversation turned back to "Nemo" and to how Mateen recently taught her how to drive. (Id. at 133:13-18). Defendant Salman explained they had rented a van, because she had recently started driving. (Id. ). Defendant Salman's demeanor was "[v]ery calm, cooperative." (Id. at 133-25). However, SA Mayo identified some "red flags" in Defendant Salman's statement, including her comment referring to Mateen with "God rest... bless his soul" prior to learning of his death. (Id. at 133:16-17; 134:14-25). This portion of the interview lasted about one hour, and Defendant Salman did not ask to leave once it was concluded. (Id. at 135:5-8, 19-21).
At approximately 8:45 a.m., SA Sypniewski informed Defendant Salman that her husband had passed away. (Id. at 135:22-25; 136:1-6). After crying for approximately five (5) minutes, (Id. at 136:17-24), her demeanor was sad but calm. (Id. at 137:2-4). SA Sypniewski's demeanor was also very calm. (Id. at 137:7-9). Following the disclosure of Mateen's death, the agents suggested that somebody should pick up her son, and Defendant Salman agreed. (Id. at 137:10-16). At 9:55 a.m., a task force officer advised that Defendant' Salman's brother-in-law, Mustafa Abasin, had arrived to collect Salman's child. (Id. at 138:1-14). There are no cameras in the area where the agents, accompanied by Defendant Salman, met Mr. Abasin to hand over custody of her child. (Id. at 38:18-21). During the meeting, nobody blocked Defendant Salman from leaving, nor did anyone tell Salman she could not leave. (Id. at 138:22-25; 139:1)
According to SA Mayo, during this exchange Mr. Abasin asked if Defendant Salman could leave with him, and "Agent Sypniewski informed him that we would like to ask her some more questions, and if she didn't mind, we would still like to talk to her some more, and she [Salman] agreed to stay and speak with us." (Id. at 139:3-7). Mr. Abasin testified at the hearing, and it was clear to the Court that English is not his first language, which the Court observed at the conclusion of the hearing. (Doc. 186, 27:11-14). With that caveat, Mr. Abasin testified that he followed an FBI car to the office where he saw Defendant Salman's son, Zakariaya, in the entry vestibule. (Doc. 184, 69:13-18; 70:16-23). Mr. Abasin observed Defendant Salman and two or three FBI agents. (Id. at 71:1-5). He described the ensuing exchange as follows:
I think I when I-when I picked up Zakariaya, I think I said that either I said to Noor [Salman] that, You can go with me, or probably I asked someone else that she can go with me ... And exactly I don't remember that if Ms. *1333 Noor responded to me or one of the F.B.I. agents that she stays. I don't remember who.[8]
(Id. at 71:14-22).
Mr. Abasin did not recall seeing anyone touch Ms. Salman; he did not remember anyone physically step in front of Defendant Salman and block her way; he did not hear anyone yell at her or threaten her; nor did he observe anyone being aggressive in any way to her.[9] (Id. at 72:3-14). Later that evening Ms. Salman returned to Mr. Abasin's house to get her son, and he described the following:
I cannot say exactly what she said to my wife, but I think that I heard that she was crying. She was very sad, she was in shock, and she said that if he had told me that, we would hold your son, if you don't tell us what happened or something like that.
(Id at 72:22-73:8).
After Mr. Abasin departed with Defendant Salman's son, the agents accompanied Defendant Salman back to the third floor conference room. (Id. at 139:8-9). The interview continued, and Defendant Salman was questioned about her stance and her husband's stance on religion. (Id. at 139:16-24). The agents informed Defendant Salman that her husband had committed a violent act in Orlando, without discussing specifics, and again inquired about what firearms Mateen owned. (Id. at 140:7-25; 141:1-3). They also discussed that she and Mateen had been to a gun range and that she had met "Nemo" in the past.[10] (Id. at 141:5-24). This portion of the interview lasted an hour and a half. (Id. at 142:12-13). Defendant Salman and the agents maintained calm demeanors during the questioning. (Id. at 142:22-143:1). Neither agent picked up a telephone in the conference room or say to anyone that they are not getting anywhere with the interview. (Id. at 143:2-4).
At this point in the interview SA Mayo was advised that SA Enriquez, who is an FBI polygraph examiner, was on his way to the office. (Id. at 143:6-11). SA Mayo entered the conference room and observed Defendant Salman on the floor apparently sleeping. (Id. at 143:19-21). He asked Defendant Salman if she was okay, and she asked when she could return to her apartment. (Id. at 143:21-23). SA Mayo explained they were obtaining a warrant and it would be a while before anybody could return to the apartment. (Id. at 143:23-144:2). Defendant Salman requested to have the consent to search form that she previously declined to sign, and she executed the form. (Id. at 144:2-23). Defendant Salman did not ask to go anywhere other than her apartment. (Id. at 144:24-145:1).
C. The Polygraph Interview
When SA Enriquez arrived, he interviewed Defendant Salman in a conference room on the second floor of the building.[11]
*1334 (Id. at 145:3-8). SA Mayo was outside the conference room and did not hear raised voices during SA Enriquez's interview. (Id. at 146:3-5). When Defendant Salman needed to use the restroom, she was able to go unaccompanied to the restroom. (Id. at 146:6-13). Ultimately Defendant Salman gave a statement to SA Enriquez, and SA Mayo witnessed SA Enriquez read each paragraph after which Defendant Salman would approve of the contents. (Id. at 147:1-19). During the interview, Defendant Salman made multiple trips to the restroom and another meal was provided. (Id. at 149:5-8). When Defendant Salman asked to speak with her son, agents called her brother-in-law so she could speak with her son. (Id. at 149:16-24).
SA Enriquez describes the polygraph process as consisting of three phases. (Id. at 192:1-2). The first phase consists of an interview or "pre-polygraph" interview where the examiner explains to the subject that she is there to take a polygraph and obtains written consent to proceed. (Id. at 192:2-9). Before conducting a polygraph examination, SA Enriquez satisfies himself that the subject has no physical or mental issues that may cause him to refrain from administering the test. (Id. at 192:16-19). The second phase is administering the polygraph test which takes approximately ten (10) minutes. (Id. at 193:2-7). The third phase is the posttest interview, which is necessary if the test is inconclusive or the subject fails the test. (Id. at 193:8-11).
Once SA Enriquez located a quiet room, the Defendant was brought into the room, and SA Enriquez introduced himself as a polygraph examiner with the FBI. (Id. at 199:23-200:8). SA Enriquez told the Defendant that he wanted to discuss what, if anything, she knew about the events in Orlando and what Mateen had been planning. (Id. at 200:5-8). SA Enriquez's did not have his weapon on his person during the interview. (Id. at 201:1-5). Defendant Salman agreed to go into the conference room with him, and the door to the room was closed. (Id. at p. 201:10-18).
SA Enriquez explained the Consent to Interview With Polygraph form to the Defendant. (Id. at p. 203:6-21). He put the form on his laptop, had Defendant Salman read the form, and then he read the form to her. (Id. at p. 204:1-3). The consent form advised Defendant Salman that the examination would concern information Salman had provided the FBI about Omar Mateen. (Govt. Ex. 22). Defendant Salman was advised she had the right to refuse to take the test and could stop the test at any time or could refuse to answer specific questions. (Doc. 184, p. 204:4-7; 206:11-24; Govt. Ex. 22). SA Enriquez advised Defendant Salman that he would conduct an interview and then determine if a polygraph examination was necessary. (Id. at p. 205:13-206:6).
The consent form concludes with the attestation that "I understand and know what I'm doing. No threats or promises have been used against me to obtain my consent to use the polygraph." (Id. at p. 207:10-12). SA Enriquez testified that he did not threaten the Defendant and specifically did not threaten that her child could end up in a Christian home is she lied.[12] (Id. at p. 207:13-25). However, he did explain to Defendant Salman the criminal penalties for lying to the FBI. (Id. at p. 208:1-16). Defendant Salman signed the consent to polygraph form in his presence. (Id. at p. 209:20-24).
*1335 Next, SA Enriquez advised Defendant Salman of her Miranda rights. (Id. at p. 210:7-16). SA Enriquez testified that the Defendant was not in custody and that he advises anybody taking a polygraph of their Miranda rights. (Id. at p. 211:3-11). SA Enriquez uses the advice of rights form in the following manner:
I read it to them. If they have any questions, I explain it to them. I also-you know, and I also tell them, look, you're here voluntarily. You don't have to talk to me if you don't want to talk to me. You can stop talking to me at any time. If you don't like me, you can walk out of this room.
Okay. And then once I read it to them and explain it to them, I have them read it and then I ask them to sign it using the stylus on the computer screen.
(Id. at 211:24-212:6).
This is how the form was used with Defendant Salman. (Id. at 212:7-8). Accordingly, prior to conducting the pre-polygraph interview, Defendant Salman was advised that she has the right to remain silent, anything she says can be used against her in court, she has the right to talk to a lawyer for advice before answering questions, she has the right to have a lawyer with her during questioning, a lawyer will be appointed if she is unable to afford one, and if she decides to answer questions without a lawyer present she can stop answering at any time. (Id. at 212:11-213:25; Govt. Ex. 21).
SA Enriquez described his interview technique as not being judgmental, being empathetic, and treating the subject with respect, explaining that "l find that when you do that, you get more-you know, people will talk to you and will be truthful to you." (Id. at 217:18-21). SA Enriquez did not yell at Defendant Salman or call her derogatory names. (Id. at 218:2-5). After talking with the Defendant and obtaining pertinent information, SA Enriquez asked if he could memorialize their conversation by having the Defendant write down what she had just stated. (Id. at 219:7-12). SA Enriquez testified that Defendant Salman was too nervous and asked him to write down her statement, saying "I'll write it, but you're gonna tell me to write." (Id. at 219:13-16). This process resulted in three (3) written statements. (Id. at 219:25-220:6; Govt. Ex. 23).
Following each substantive topic covered during the course of the interview, SA Enriquez would stop to document the information. (Id. at 221:6-21). The procedure employed by SA Enriquez is as follows:
I'm gonna write this statement. You're gonna tell me what to write and then-but then I'm gonna read it to you. You're gonna read it. And you're gonna initial the beginning and the end of each paragraph.
And there's two reasons we do that. One is for, for her, for Noor Salman. These are your words. All right. This is what you told me. And you initial it. You indicate that this is accurate and correct.
The other reason we do this, I explained it to her like I explain to everyone else, this will ensure you that no one can come behind you and add something to this.
(Id. at 221:14-24).
At the conclusion of the written statement, SA Enriquez asked the Defendant to indicate whether she has been treated correctly, whether she gave the information freely and voluntarily, whether there had been any promises, and whether she had been afforded bathroom breaks and food and water. (Id. at 225:8-22).
Once the first statement was completed, SA Enriquez saw the Defendant had written "I am sorry for what happened. I wish I'd go back and tell his family and the police what he was going to do." (Id. at *1336 226:17-19; Doc. 107-6, p. 10). SA Enriquez interpreted this statement as an admission that Defendant Salman knew in advance that Mateen intended to commit the attack. (Doc. 184, 227:2-8). Defendant Salman had up to that point denied such knowledge, so SA Enriquez confronted her by telling her he was disappointed in her lack of candor. (Id. ). In response, Defendant Salman admitted she had known of the pending attack in advance, prompting SA Enriquez to continue the interview. (Id. at 227:6-13). The first statement was signed by the Defendant at 2:32 p.m. (Doc. 107-6, p. 10).
Before continuing with the interview, SA Enriquez called SA Mayo and SA Sypniewski into the room to witness him asking Defendant Salman to confirm that the statement was accurate and correct. (Doc. 184, 227:13-20). SA Enriquez advised the Defendant that because she was not completely truthful with him in the first statement, he was going to ask her what led her to believe Mateen was going to perpetrate the attack. (Id. at 228:10-16). At no time did the Defendant ask to stop the interview or request a lawyer. (Id. at 228:24-229:3). The process of creating and verifying the second and third statement is the same as described for the first statement.[13] (Id. at 230:2-232:5).
IV. DISCUSSION
A. Whether Defendant Salman was Unlawfully Seized
"A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " Kaupp v. Texas, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (citations omitted). The test cited by the Court in Kaupp is derived from the Court's decision in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Kaupp, 538 U.S. at 630, 123 S.Ct. 1843. In Mendenhall, the Court provides the following criteria for determining when a person has been seized:
... the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
Kaupp, 538 U.S. at 630, 123 S.Ct. 1843 (citing Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870 ). In Hayes v. Florida, 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), the Supreme Court held that the involuntary transport of a citizen to a police station for questioning is "sufficiently like arres[t] to invoke the traditional rule that arrests may constitutionally be made only on probable cause." Kaupp, 538 U.S. at 630, 123 S.Ct. 1843.[14]
The District Court for the Northern District of Georgia, citing Eleventh Circuit precedent, has also enumerated a non-exclusive list of factors that may indicate when an arrest has occurred:
*1337 The blocking of an individual's path or the impeding of his progress; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual.
United States v. Chaidez-Reyes, 996 F.Supp.2d 1321, 1335 (N.D. Ga. 2014) (citing United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989) ); see also, United States v. Perez, 443 F.3d 772, 778 (11th Cir. 2006). The test is an objective one, and an officer's subjective belief that an individual was not arrested is irrelevant, especially when that belief has not been communicated to the accused. Id.
In Chaidez-Reyes, the Court found detention occurred where the defendant was "forced to lay prone on the ground, handcuffed, and searched." Id. The Court acknowledged, however, that certain circumstances may warrant ordering a suspect to lie face down without converting temporary detention into an arrest. Chaidez-Reyes, 996 F.Supp.2d at 1336 (citing Courson v. McMillian, 939 F.2d 1479, 1492-93 (11th Cir. 1991) ). Even temporarily handcuffing a suspect does not necessarily transform an investigatory detention into a formal arrest. Id. (citing United States v. Acosta, 363 F.3d 1141, 1149 (11th Cir. 2004) ). And an officer who has lawfully stopped an individual may "conduct a carefully limited search of the outer clothing ... in an attempt to discover weapons which might be used to assault him." Id. (citing United States v. Hunter, 291 F.3d 1302, 1307 (11th Cir. 2002) ). Accordingly, temporary and limited direction imposed upon a citizen by the police does not automatically convert a consensual encounter into an arrest.
It is axiomatic, and defense counsel agrees, that if Defendant Salman voluntarily agreed to wait for SA Mayo to arrive on the scene there can be no unlawful detention in violation of the Fourth Amendment. (Doc. 186, 21:24-25). Counsel for Defendant Salman contends that detention occurred-if at all-once she was placed inside LT Hall's patrol car. (Id. at 19:14-21). The Court's analysis must begin with a review of the facts that culminated in Defendant Salman sitting in LT Hall's vehicle.
At approximately 4:35 a.m. on June 12, 2016, LT Hall arrived at the apartment complex where Defendant Salman resided with her husband and her son.[15] LT Hall called Defendant Salman on the telephone, identified himself as a lieutenant with the Fort Pierce Police Department, and stated that he would like to talk to her. LT Hall asked Defendant Salman to come outside to meet him. Officers Trinidad and Incorvia, along with Sergeant Donnon, were positioned in the shadows of a tree. (Doc. 184, 25:8-12). LT Hall was in uniform, equipped with a sidearm and was holding his long weapon at the low ready with the muzzle out to less than 45 degrees. (Id. at 25:16-26:2). By the time Defendant Salman exited the apartment and got to him, LT Hall had put his long weapon away. LT Hall explained to Defendant Salman that there was a situation and somebody in Orlando needed to talk to her. He then asked if he could go into her apartment to make sure there was nobody else in the apartment; Defendant Salman agreed with the request.
LT Hall accompanied the Defendant back to her apartment, conducted a visual sweep of the premises, and allowed Defendant Salman to enter her bedroom unaccompanied *1338 to change out of her pajamas. Since law enforcement were seeking the issuance of a search warrant, Defendant Salman and her son departed the apartment. When Defendant Salman asked if she would need her cellular telephone, LT Hall informed her he did not think she would need the device and suggested she leave it on the table, and the Defendant complied with the request. Defendant Salman describes the encounter in starkly different terms and attests that she was ordered out of the apartment and was confronted by officers with guns drawn and pointed at her. As previously discussed in this order, Defendant Salman elected not to testify during the evidentiary hearing, and the Court was unable to consider her demeanor. The Court had the opportunity to consider LT Hall's demeanor and finds him to be credible. The Court further notes that Defendant Salman's affidavit is contradicted by LT Hall, SA Mayo, and by Mr. Abasin. Accordingly, the Court does not find Defendant Salman's version of these events to be credible.
Thus far in the analysis, the encounter between Defendant Salman and law enforcement officers lacks the hallmark characteristics associated with a seizure: that is, an arrest. LT Hall and his subordinates took pains to present themselves in a non-threatening manner as evidenced by the discrete positioning of Officers Trinidad and Incorvia and Sergeant Donnon to provide protection for LT Hall while concealing themselves from the Defendant. LT Hall quickly assessed the situation and handed his assault rifle to a colleague who placed it into the trunk of a patrol car before Defendant Salman approached and spoke with LT Hall. Accordingly, there was no overt display of weapons and no threatening presence of multiple officers which are indicative of detention. Similarly, LT Hall's demeanor and the language he employed was non-threatening.
LT Hall testified that he did have physical contact with Defendant Salman, but it was limited to touching her shoulder in a reassuring manner when they were walking down the hallway. (Id. at 30:5-8). The only other physical contact with the Defendant occurred later-after the Defendant and her son had accepted LT Hall's offer to sit in the backseat of his patrol car-when a female FBI agent conducted a pat-down of Defendant Salman. A limited pat-down of the Defendant is insufficient to constitute detention.
The Court finds Defendant Salman willingly exited her apartment to speak with LT Hall and voluntarily accompanied LT Hall outside of her apartment to the parking lot where his patrol car was parked. The Fort Pierce police department deployed their vehicles and the officers with considerable discretion to avoid intimidating the Defendant. With the exception of LT Hall's unmarked patrol car and one marked unit, the balance of the law enforcement vehicles were parked at the entrance of the Apartment Complex. LT Hall's unmarked vehicle was positioned almost to the hallway in the parking lot, close to Defendant Salman's apartment. Neither LT Hall's unit nor the marked unit had their emergency lights turned on.
LT Hall explained that it was June and the weather was hot and muggy, so he asked Defendant Salman if she wanted to sit in the backseat of his car, with her son, while waiting for the person to arrive from Orlando. The patrol car did not have a divider or barrier between the back and front seats, and the Defendant was not restrained. The door to the backseat remained open while the air conditioning was running, and the Defendant was free to exit at will. This is demonstrated by the Defendant taking her son to urinate next to a dumpster on the complex property. Moreover, SA Mayo testified that upon his *1339 arrival he observed the Defendant sitting in the backseat of LT Hall's vehicle with her feet hanging out of the car. Defendant Salman never asked LT Hall if she could leave, and LT Hall was standing approximately ten (10) feet away from the Defendant with Officer Trinidad while she was in the vehicle. LT Hall limited his conversation with Defendant Salman to asking her the type of vehicle her husband left home in. Defendant Salman remained in LT Hall's patrol car with her son for about forty-five minutes before SA Mayo arrived.
Based upon the circumstances surrounding the initial encounter with Defendant Salman through the arrival of SA Mayo, the Court finds the conduct of the Fort Pierce Police Department would not have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business. Defendant Salman had been informed that something had happened in Orlando, had been asked to describe the vehicle Mateen had driven when he left home the previous night, and knew an individual was coming from Orlando to speak with her. The Defendant was not prevented from leaving the scene, and common sense dictates that she had an interest in waiting to speak with the person from Orlando who could shed light on the events of that morning. In short, Defendant Salman consented to wait for SA Mayo to arrive and none of the actions by the Fort Pierce Police Department, considered as a whole, would cause a reasonable person to believe she could not ignore the police presence and go about her business.[16]
At approximately 5:45 a.m., SA Mayo arrived at the apartment complex; he identified himself to Defendant Salman and obtained biographical information. SA Mayo's firearm was concealed from view at all times. He then asked the Defendant is she knew the whereabouts of her husband, and Defendant Salman explained her husband had gone to visit a friend, Nemo, the previous night. SA Mayo described their conversation as normal with both he and Defendant Salman remaining calm, even when the conversation turned to whether Mateen harbored ill-will toward the United States. SA Mayo spoke with the Defendant for approximately 15-20 minutes of the 90 mintues that he was at the apartment complex. At one point during their conversation, SA Mayo provided Defendant Salman a written form used to obtained consent to search her apartment. Defendant Salman declined to sign the form, and she advised SA Mayo that at that point in time she did not want the FBI looking through her apartment.
SA Mayo wanted to continue the interview of Defendant Salman, but he knew a search warrant was being sought for Salman's apartment and her vehicle. Rather than engage in a lengthy interview in the parking lot, he asked Defendant Salman if she would agree to go to the local FBI field office to continue the conversation. Defendant Salman agreed to go with him, and SA Mayo discontinued the interview pending the arrival of a female special agent.[17] Once SA Kristine Goetz arrived, SA Mayo drove them to the FBI Office in his unmarked vehicle, and the Defendant was not restrained during the seven-minute drive to the office. Defendant Salman's interaction with SA Mayo and SA Goetz does not lead the Court to conclude that *1340 the Defendant had been detained at the time she accompanied them to the FBI Office. To the contrary, the Defendant consented to go to the FBI Office with the agents and was not prevented from ignoring the police and going about her business.
Simply stated, Defendant Salman had not been arrested when she accepted LT Hall's offer to sit in his patrol car with the door open while she waited for SA Mayo to arrive, and she was not under arrest when she accompanied SA Mayo and SA Goetz to the FBI Office.[18] Neither the Fort Pierce Police Department nor the FBI violated Defendant Salman's right under the Fourth Amendment to be free from unlawful seizure: that is, an arrest not based upon probable cause.
B. Whether the Questioning of Defendant Salman Required Miranda Warnings
A suspect is entitled to Miranda warnings when she is interrogated while in custody, because such circumstances are presumed to exert pressure on her to speak. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "[T]he ultimate inquire is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[19] Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) ). The test employed by the Court is objective; the subjective beliefs of either the defendant or the interviewing officer on whether the defendant is free to leave or is under arrest are irrelevant. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996). The only relevant inquiry is how a reasonable person in the defendant's position would have understood his situation. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Courts are required to examine all of the circumstances surrounding the interrogation, and no particular fact in the analysis is outcome determinative. United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006).
1. Questioning at the Patrol Car
Defendant Salman argues that her questioning by FBI SA Mayo while she was in the backseat of LT Hall's patrol car constituted a custodial interrogation, mandating that she be advised of her Miranda rights. (Doc. 107, p. 7). Defendant Salman lists the following factors as establishing that a reasonable person in her position would have understood her freedom of action had been curtailed to a degree associated with formal arrest: "the brandishing of weapons, touching Salman, the language used, and the location and length of detention." (Id. at p. 8).
The Defendant acknowledges that the brandishing of weapons by police and control of her upon re-entry into the apartment may be insufficient to constitute custody.
*1341 (Id. ) (quoting United States v. Luna-Encinas, 603 F.3d 876, 881-882 (11th Cir. 2010) (holding brandishing of weapons and brief control of the petitioner during the search was insufficient to constitute custody under Miranda ) ). The defense argues, however, that in addition to these factors, Defendant Salman had been under constant control for hours before and during her questioning, had been searched, and could not leave or decline the officers' instructions. (Id. ).
As discussed in Section lll(A) of this Order, the Court finds the Fort Pierce Police Department exercised considerable discretion and restraint by ensuring that the officers providing protection for LT Hall were positioned in a manner to avoid intimidating the Defendant, while allowing a tactical advantage. LT Hall, a seasoned law enforcement officer, quickly assessed the situation and determined Defendant Salman did not pose a threat to him, causing him to hand his rifle to a colleague who placed it out of her view. To the extent weapons were brandished, the evidence presented at the evidentiary hearing leads the Court to conclude the presence of weapons would not have caused a reasonable innocent person to conclude she was under arrest. The Court also disagrees with the Defendant's characterization that she was controlled by the police upon re-entering her apartment. To the contrary, the police requested permission to conduct a visual sweep of her apartment, and Defendant Salman gave LT Hall permission to proceed. Defendant Salman waited in the hallway for a brief period of time, and once LT Hall determined the apartment contained no threatening individuals or devices, she was permitted to go unescorted into her bedroom to change her clothing. These facts fall far short of control.
Turning to the period of time that expired between the initial police contact at 4:45 a.m. and the arrival of SA Mayo at 5:45 a.m., it does not appear from the Defendant's motion to suppress that she contends the brief questioning by LT Hall concerning the type of vehicle Mateen drove the previous evening constituted an interrogation.[20] During this one-hour block of time, the Defendant voluntarily exited her apartment to speak with LT Hall, consented to LT Hall's request to check her apartment, changed her clothing, and came outside with her son. Since a search warrant was being obtained for the apartment, and because Defendant Salman agreed to wait for SA Mayo to arrive from Orlando to speak with her, LT Hall offered Defendant Salman the option of sitting in his unmarked patrol car to take advantage of the air conditioning. The Defendant was not compelled to sit in the patrol car, distinguishing the facts of this case from Commonwealth v. Meyer, 488 Pa. 297, 306, 412 A.2d 517 (1980), cited by the defense.
Defendant Salman was not in handcuffs, the car door remained open, and she was free to exit the vehicle with her son. The testimony establishes that Defendant Salman did not ask to leave the area and did not request that an officer call a family member for her. With the exception of getting water for the Defendant and her son, and suggesting where her son could urinate, LT Hall remained approximately ten (10) feet away from the Defendant. While Defendant Salman states in her declaration that the "officers said [she] needed to stay here and wait for the F.B.I.," the Court credits the testimony of LT Hall over the Defendant's declaration. The facts surrounding this one-hour period of time do not support a finding that Defendant *1342 Salman was in custody. The fact that a female officer conducted a brief pat-down for weapons does not change the outcome of this analysis. Hunter, 291 F.3d at 1307. Nor does a custodial setting arise from Defendant Salman's inability to use her cellular phone, as is argued by the defense. When the Defendant asked LT Hall if she needed her phone, LT Hall replied that he did not think she needed the phone and suggested she leave it on a table. Defendant Salman never asked LT Hall to call anyone on her behalf, rendering the absence of her phone of little significance.[21]
SA Mayo arrived on the scene at 5:45 a.m., and he observed the Defendant seated in the backseat of LT Hall's patrol car with her legs hanging outside the car. After introducing himself, he questioned the Defendant for 15-20 minutes. The remainder of the time between LT Hall's arrival at 5:45 a.m. and their departure for the FBI Office at 7:15 a.m. consisted of LT Hall waiting for a female agent to arrive. During this one-and-one-half hour period, Defendant Salman took her son over to an area near a dumpster so he could urinate. SA Mayo testified that Defendant Salman consented to speaking with him and agreed to travel to the local FBI office to continue their conversation. The Defendant argues that the failure by SA Mayo to "remove Salman from the back seat [of the patrol car] and bring her to a neutral setting" favors a finding of detention. This argument ignores the fact that Defendant Salman's apartment had been secured pending the issuance of a search warrant, leaving no readily available or apparent "neutral" setting where they could continue the interview.
The Defendant also contends that she was "surrounded by law enforcement" while SA Mayo questioned her. (Doc. 107, p. 9). LT Hall testified that he and one other officer were positioned ten (10) feet away from the vehicle, and the other officers were positioned by the entrance to the apartment complex. This latter fact was corroborated by SA Mayo who passed the Fort Pierce Police Officers as he entered the complex. In her declaration, Defendant Salman does not attest to the number of officers that were in the vicinity when SA Mayo asked her questions. (Doc. 107-1, generally). Finally, Defendant Salman's argument that she could not decline the officers' instructions is contradicted by the fact that she declined to sign the consent to search form presented to her by SA Mayo where he sought consent to search her apartment.
The totality of the facts, including that Defendant Salman was not restrained, had the ability to exit the patrol car with her son and did so at least once, was questioned for no more than 20 minutes, and had exercised her right to refuse to consent to the search of her apartment do not support a finding that a reasonable person in her situation would conclude she was under arrest. Because Defendant Salman was not in custody during the questioning by LT Hall or SA Mayo in the parking lot of her apartment complex, the officers were not required to advise Salman of her Miranda rights.
2. Questioning at the FBI Office (by SAs Mayo and Goetz )
Defendant Salman contends the FBI directed and drove her to their field *1343 office where the agents continued to interrogate her. (Doc. 107, p. 10). This Court has determined that Defendant Salman voluntarily accompanied SA Mayo and SA Goetz to the local FBI Office. Regardless, the Defendant asserts that "an interrogation at a police station goes to the heart of the Miranda warnings, and the location of the police station is a significant factor." (Id. ) (citing Howes v. Fields, 565 U.S. 499, 511, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012) ). Coupled with the interview setting, the defense argues Defendant Salman "lacked a car, a phone, or any ability to leave, and when she attempted to leave with her brother-in-law, she was physically blocked." (Id. at p. 11).
As used in the Supreme Court's Miranda case law, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Fields, 565 U.S. at 508-509, 132 S.Ct. 1181 (quotations and citations omitted). The Court directs the reviewing trial judge to consider "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." Id. at 509, 132 S.Ct. 1181 (quotations and citations omitted). However, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda .... [The Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry."[22] Id. (quotations and citations omitted). The Court notes, however, that "inherently compelling pressures ... are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." Id. at 511, 132 S.Ct. 1181 (quotations and citations omitted).
SA Mayo described the circumstances surrounding the continued interview of Defendant Salman at the FBI Office. While driving to the office, SA Mayo offered to get the Defendant and her son breakfast, and another agent brought food to the office shortly after they had arrived. The interview took place in a large conference room with Defendant Salman seated on the opposite side of the table from SA Mayo. The door to the conference room remained open the entire time. The Defendant's son was permitted to play and was given paper to draw with, and the Defendant was never placed in restraints. The restroom on the third floor where the conference room is located is in the common area of the multi-occupancy office building. As a result, and agent had to walk the Defendant to the restroom to enable her to get back into the FBI offices.
The interview began at approximately 7:35 am, and approximately one hour later, SA Sypniewski informed the Defendant that her husband had died. Throughout the interview, the FBI Agents and the Defendant remained calm, although Defendant cried for a short time after learning of Mateen's death. One of the FBI agents suggested that someone be contacted to pick up Defendant Salman's son, so they could continue the interview, and the Defendant agreed. An FBI agent contacted Mateen's parents, and about an hour later *1344 Mateen's brother, Mr. Abasin, arrived to pick up his nephew. The agents accompanied Defendant Salman to the lobby where Mr. Abasin was waiting. After Mr. Abasin greeted Defendant Salman, he asked either the Defendant or an agent if Defendant Salman could leave with him. According to SA Mayo, Agent Sypniewski replied that he would like to ask her additional questions, if she did not mind, and Defendant Salman agreed to stay. Mr. Abas in testified that either the Defendant or an agent said "she stay." As previously addressed in this Order, the Court observed that Mr. Abasin's proficiency in English is very limited. Defendant Salman attests in her declaration that one of the agents blocked her exit, preventing her from leaving. This statement is contradicted by SA Mayo and Mr. Abasin, and the Court concludes Defendant's Salman was not prevented from leaving with Mr. Abasin and instead elected to remain at the FBI Office.
Upon returning to the conference room, the interview continued for an hour and a half. During the interview at the FBI Office, Defendant Salman discussed an incident in 2013 when Mateen was interviewed by the FBI, stating that he did not harbor ill-will towards the United States. The agents inquired about Mateen's position on religion and the Defendant's views on that subject. The interview also covered Mateen's relationship with "Nemo," and that the Defendant and Mateen had been to a gun range together. The agents and Defendant Salman were calm during the interview. The only time agents challenged the Defendant's statements was when she denied having been to the gun range, at which point Agent Sypniewski stated the FBI had video showing her at the range. While this statement was not true, the tone of the conversation and the demeanor of the agents did not change when challenging the Defendant's prior answer. Agents spoke with the Defendant for approximately 90 minutes after Mr. Abasin departed.[23]
The questioning stopped to wait for SA Enriquez, an FBI polygraph examiner, to arrive. When SA Mayo returned to the conference room to check on Defendant Salman, she appeared to be sleeping or resting. SA Mayo asked if she was okay, and the Defendant asked when she could return to her apartment. She did not ask to leave or to be taken to any other location. SA Mayo explained that the apartment cannot be accessed until the search is completed. The Defendant then requested the consent to search form that she previously declined to sign and executed the document.
That the Defendant felt comfortable enough to either fall asleep or close her eyes to rest while waiting for SA Enriquez to arrive weighs against finding the conference room at the FBI Office equates with the "inherently compelling pressures" associated with a police station. This finding is bolstered by the photograph of the conference room which appears for all purposes to be a standard office conference room, the absence of physical restraints, and the relatively short duration of the interview (something less than 3 hours). Moreover, the Defendant's responses to questions up to this point had been to deny knowledge of Mateen's plan to commit the attack and to describing herself and Mateen and religiously moderate with no hostility toward the United States. That Defendant Salman agreed to stay behind to *1345 answer additional questions when Mr. Abas in departed with her son strongly favors a finding of voluntariness as opposed to custody.
Considering the totality of the circumstances, the Court finds the Defendant was not in custody during the time she was being questioned by SA Mayo and SA Sypniewski at the FBI Office. As a result, the special agents were not required to advise the Defendant of her Miranda rights. While the defense argues that United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990), is applicable-which holds that "[a] frequent recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues,"-it is worth noting that the Defendant was not in the presence of family or friends when she decided to accompany FBI agents to their Office. The Defendant had been home with her son, who did accompany her initially, and agreed to continue the interview at the FBI Office. From the moment the Defendant agreed to speak with LT Hall in the parking lot of her apartment complex until the moment SA Enriquez began his interview by advising Defendant Salman of her Miranda rights, the Defendant was not under formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
C. Failing to Provide Cleansing Warnings
When SA Enriquez, the FBI polygraph examiner, arrived at the Fort Pierce FBI Office, he was shown to a conference room on the second floor to conduct the pre-polygraph interview of Defendant Salman. The Defendant argues that since SA Mayo was not making progress with Defendant Salman, the interrogation was moved to a smaller room. (Doc. 107, p. 14). However, SA Enriquez testified that the large conference room on the third floor was in an area that was too noisy for a polygraph examination. The second floor conference room is relatively large, easily accommodating four (4) adults and with sliding glass doors leading to a balcony. SA Enriquez's explanation for the move to a different conference room is credible, and the Court does not consider the new location to constitute an interrogation tactic.
As described in detail in Section III of this Order, SA Enriquez introduced himself to Defendant Salman, explained the topic he wanted to discuss with her, and obtained her consent to be interviewed by him. Before questioning Defendant Salman, SA Enriquez explained the Consent to Interview with Polygraph form to the Defendant and, after she read the form and after he read it aloud to her, Defendant Salman signed the consent form. The consent form includes admonitions that she has the right to refuse to participate in the examination, can stop it at any time, and may elect not to answer questions. The consent form was signed by the Defendant at 12:34 p.m. (Doc. 107-6; Govt. Ex. 22). Next, SA Enriquez used an Advice of Rights form to advise Defendant Salman of her Miranda rights. He read the advice of rights to the Defendant, allowed her to read the form, and obtained her written consent.[24] (Doc. 107-6, Govt. Ex. 21). What followed was a series of three (3) written statements prepared by SA Enriquez based upon information provided by, and verified by, the Defendant.
The Defendant argues that the Miranda warnings given by SA Enriquez are inadequate to render the three statements *1346 admissible because SA Enriquez used an improper interrogation technique designed to circumvent the purpose of Miranda warnings. (Doc. 107, pp. 13-14). In support of this argument, the defense cites Missouri v. Seibert, 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In Seibert, the Court confronted the "police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession ... [after which] the interrogating officer follows it with Miranda warnings and then leads the suspect to cover the same ground a second time." Seibert, 542 U.S. at 604, 124 S.Ct. 2601. The question before the Court was the admissibility of the "repeated statement." Id.
Seibert is easily distinguished from the facts of the instant case. First, in Seibert the Court operated from the premise that the defendant was in custody when she was interrogated by a Missouri police officer without the benefit of Miranda warnings. Secondly, once Seibert confessed to the crime, the officer turned on a recorder, advised Seibert of her Miranda rights, and repeated her previous confession chapter-and-verse. Id. at 605, 124 S.Ct. 2601. Here, Defendant Salman was not in custody when she was interviewed by SA Mayo at the complex or when she was interviewed by SA Mayo and SA Sypniewski at the FBI Office. Since Miranda warnings are only required when the interviewee is in custody and is being interrogated, the pre- Miranda statements made by Defendant Salman are admissible.[25] That is, an officer cannot engage in the interrogation technique scrutinized by the Court in Seibert unless the original confession should have been preceded by Miranda warnings. Additionally, the three (3) statements obtained by SA Enriquez are vastly different from the statements obtained by SA Mayo. This is not an instance where the content of the three (3) statements was obtained by SA Mayo without Miranda warnings followed by SA Enriquez providing Miranda warnings later to "clean up" the earlier statements.
The solitary fact pointed to by the defense that was elicited by SA Mayo and again by SA Enriquez is that Mateen owned a rifle. SA Mayo testified the Defendant initially stated Mateen owned a pistol and later made a reference to a long gun. (Doc. 184, 140:23-25). While the defense characterizes this as a the improperly solicited statement or confession that was reaffirmed following Miranda warnings-the offense presumably being lying to the FBI-the defense also acknowledges it is not clear Salman intended to mislead the agents. (Doc. 17, p. 15). If the statement obtained by SA Mayo concerning the long gun is not a confession, Seibert is inapposite. Regardless, since the pre- Miranda statements were not given in the context of a custodial setting, the subsequent administration of Miranda warnings is not objectionable. The Miranda warnings given by SA Enriquez were proper, and the three (3) post- Miranda statements are admissible.[26]
*1347 D. Whether Defendant's Post- Miranda Statement were Voluntary
"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because [it is] not voluntary, the issue is controlled by that portion of the Fifth Amendment ... commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' " Seibert , 542 U.S. at 607, 124 S.Ct. 2601 (citations omitted). Failure to give Miranda warnings in a custodial setting generally requires exclusion of any statement obtained. Id. at 608, 124 S.Ct. 2601. "Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and ... tends to end with a finding of a valid waiver." Id. at 608-609, 124 S.Ct. 2601 ; see also Berkemer v. McCarty, 468 U.S. 420, 433 n.20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.").
The Defendant cites Dickerson v. United States, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), for the proposition that the Court must examine "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." (Doc. 107, p. 16). The issue before the Court in Dickerson, however, was whether Congress intended to overrule Miranda by enacting 18 U.S.C. § 3501. Dickerson, 530 U.S. at 436, 120 S.Ct. 2326. In discussing the law governing the admissibility of confessions, the Court noted that "[p]rior to Miranda, we evaluated the admissibility of a suspect's confession under a voluntariness test." Id. at 433, 120 S.Ct. 2326. Over time, the Court recognized two additional bases for the requirement that a confession must be voluntary to be admissible: "the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." Id. Miranda, the Court concluded, "changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements." Id. at 434, 120 S.Ct. 2326. Four years after the Court decided Dickerson, it decided Seibert, which reaffirms that where Miranda rights have been given to the defendant, it will be a rare instance where a defendant can demonstrate that her confession was not voluntary.
However, as the defense correctly points out, the mere fact that Miranda warnings were given to a defendant, after which the defendant made incriminating statements, does not bring the inquiry of voluntariness to an end. In Hubbard v. Haley, 317 F.3d 1245, 1251 (11th Cir. 2003), the court reviewed the district court's denial of petitioner Hubbard's 28 U.S.C. § 2254 petition in which he argued that his post- Miranda statements should have been suppressed during his state-court trial. The petitioner was taken into custody on suspicion of having committed murder. Id. at 1249. Hubbard claimed his statements were involuntary because he was intoxicated at the time he made it and argued the officers coerced his statements by initially withholding, and later offering, alcohol in exchange for his signature on the statement. Id. at 1252.
The Eleventh Circuit Court of Appeals reviewed the petitioner's claim by considering the totality of the circumstances, including the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical *1348 force against him, or the use of any promises or inducements by police. Id. at 1253. The district court and the Court of Appeals found the police officer did not offer to provide Hubbard alcohol in exchange for making the statement. Id. While the officer allowed Hubbard to have a drink of alcohol prior to signing his statement, the contents of the statement were obtained prior to allowing the petitioner to consume alcohol. Id. The court concluded this violation of police policy did not amount to coercion. Id. The record also showed the petitioner requested the whiskey, which had been previously taken from his person, as opposed to the officer offering it as a means of compulsion. Id. Additionally, multiple witnesses testified that Hubbard was not intoxicated during the interview. Id. Having consumed some alcohol without resulting ill-effects does not render a confession involuntary. Id. at 1254. As to the petitioner's claim that his low I.Q. rendered his statement involuntary, the district court relied on hospital records showing he was free of mental disease or defect. Id. "[C]oercive police activity is a necessary predicate to a finding that the confession by a person with a low intelligence level is involuntary." Id. (citation omitted).
Defendant Salman claims her post- Miranda statements were involuntary for the following reasons: (1) the statements were preceded by an "exhaustingly long interrogation and impermissible threats to take Salman's child"; (2) "her [presumably low] intelligence"; (3) "lack of experience with law enforcement"; (4) "her psychological vulnerabilities"; and (4) "the factual impossibility of admissions made by Salman."[27] (Doc. 107, pp. 16-17). The Defendant alleges that SA Enriquez used the pretext of a polygraph examination, during which she would have cleared her name, to compel her to waive her Miranda rights. (Id. at p. 17). She further submits that she was threatened by SA Enriquez who allegedly told her "that if she was lying, she would lose her child and he would be raised in a 'Christian home.' " (Id. ).
Turning now to the factors identified by the Defendant, the Court notes that no evidence was presented during the suppression hearing, or in the written briefing, to support the contention that certain admissions made by Defendant Salman were impossible. Defendant Salman is attributed with having stated that a week prior to the Pulse nightclub attack that she and Mateen went to Orlando, and "[w]e drove around the Pulse nightclub after we ate at the Arabic restaurant." (Doc. 184, 256:23-257:3). On cross-examination, counsel for Defendant Salman asked, "So it would shock you if it wasn't true," adding "It would be shocking to you if the GPS shows they never got anywhere near it?" (Id. at 257:6-11). The Court assumes this exchange is what the defense is referencing when arguing that involuntariness is demonstrated by "factual impossibility" of her statement. Of course, questions of counsel are not evidence, and neither party has presented any evidence on the issue of what a GPS may or may not have shown. Counsel's questions to SA Enriquez are insufficient to support a factual finding by this Court. Even assuming counsel is correct, there may be an entirely innocent explanation for the discrepancy between the GPS data and Defendant Salman's statement.
As for Defendant Salman's alleged low I.Q., the Court knows from previous hearings *1349 that Defendant Salman obtained an associate's degree. The defense submitted Defendant Salman's high school records that show she was enrolled in an individualized education program. (Doc. 107-2). The records also reveal the following:
Noor is a senior enrolled in all mainstreamed classes this semester. Last semester she had a curricular support/study skills class, but she is now serving as a teacher's aide for that class and is earning an A for outstanding contributions. Noor has Algebra B, Political Science, Journalism, English, and Library. Noor is passing all her required classes and is on target for graduating. She has passed the writing proficiency, also. Noor's attendance and punctuality are very good. She is dependable and hard-working. Noor has been accepted at Heald Business College after graduation. She received the Bank of America Special Recognition of Achievement Award as a senior.... She has qualified for support due to a specific Learning Disability which continues at the college level, if desired. Noor will be exited from special education when she graduates from high school.[28]
(Doc. 107-2, p. 11).
The Psychoeducational File Review Re-evaluation, dated June 10, 2003, prepared when Defendant Salman was in the 11th grade, indicates that Arabic is her first language. (Id. at p. 27). The evaluation provides that she has "cognitive skills within the borderline range and identified processing deficits in the area of visual perceptional skill." (Id. ). Defendant's Expert, Dr. Frumkin, evaluated her and issued a report finding, in pertinent part, that Defendant Salman has a "Verbal Comprehension Index score of 100 (50%)." (Doc. 107-12, p. 2). Dr. Frumkin opined that:
Verbal Comprehension is much more relevant to issues pertaining to knowing and intelligent use of Miranda warnings and her score falls squarely in the Average range .... There is nothing intrinsic in her intellectual functioning nor her current Miranda understanding and appreciation that puts her at risk for not having been able to make a knowing and intelligent waiver of her rights at the time she was administered them by law enforcement.
(Id. ) (emphasis added).
Notwithstanding this assessment, Dr. Frumkin goes on to opine that the Defendant stated she did not recall having Miranda warnings read to her, and "[i]t is quite likely that when read the warnings, she was not attentive and she would not have been able to incorporate what was read to her into her memory." (Id. ). This conclusion is in conflict with the test results obtained by Dr. Frumkin and appears to be speculation supported only by the Defendant's statement that she does not recall the Miranda warnings. Whether the Defendant recalled hearing the Miranda warnings at the time of Dr. Frumkin's evaluation-which she knew was being conducted for the purpose of trial and not treatment-does not result in a finding that the Defendant's waiver was not knowing and voluntary at the time it was made. To this point, the test result confirms there is nothing intrinsic in Defendant Salman's intellectual functioning that put her at risk of not understanding the Miranda warnings given by SA Enriquez. This conclusion is supported by the testimony of SA Enriquez who stated that he routinely *1350 evaluates polygraph examination interviewees for competency, did so here, and Defendant Salman did not appear to have competence issues. (Doc. 184, 232:24-233:3). The Court finds the Defendant's intellectual capacity did not render her post- Miranda statements involuntary. See Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir. 1988) ; United States v. Tatro, Case No. 6:15-cr-176-Orl-37KRS, 2016 WL 3059542 (M.D. Fla. May 31, 2016).
Similarly, Dr. Frumkin opined in his written report that the Defendant is "a highly suggestible individual to the types of interrogation tactics law enforcement almost always use to extract confessions from those they believe are guilty." (Doc. 107-12, p. 3). Dr. Frumkin's report does not comment upon the specific interrogation tactics employed in the instant case or how those specific tactics impact the voluntariness of her statements. Next, Dr. Frumkin describes the results of the "GSS 1" test that shows Defendant Salman "is no more likely to give in to leading or misleading information compared to the average person." (Id. ). Yet Dr. Frumkin opines that "when pressured" the Defendant will shift her responses to questions. (Id. ).
The three statements given by the Defendant contain clearly verifiable information, including fairly expensive spending by Mateen for the benefit of Defendant Salman in the days leading up to the attack, the purchase of a rifle and ammunition in advance of the attack, and the fact that Mateen rented a van used in the attack. (Doc. 107-6). There is no evidence in the record that the Defendant shifted her answer in response to police pressure in providing these truthful statements. While the Defendant did initially deny having gone to the gun range with Mateen, and admitted this only after an agent told her video existed proving otherwise, the Defendant's ultimate admission was proved to be truthful. Based upon the record evidence, the Court finds the Defendant did not suffer from a psychological condition that rendered her statements involuntary.[29]
Both the Defendant and Dr. Frumkin reference a statement attributed to SA Enriquez where it is alleged he told the Defendant her child could end up in a Christian home if she lied. (Doc. 107, p. 17; 107-12, p. 3). SA Enriquez was questioned about this alleged colloquy, and he denied having threatened the Defendant and denied telling the Defendant her son could end up in a Christian home if she lied. (Doc. 184, 207:13-25). The Court observed SA Enriquez's demeanor and finds him credible. SA Enriquez advised the Defendant of the importance of being honest with him, including that lying to the FBI is a criminal offense. (Id. at 208:1-16). However, merely advising an interviewee of the truthful consequences of lying is not coercive and does not render the statements involuntary. See United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (telling a defendant that unless he explained the participation of his girlfriend in the crime, she would remain a suspect is not coercive, because the statement is true).
Finally, the Court does not find the length of the interrogation or the possibility of a polygraph examination to constitute coercion under the facts of this case. The Defendant's first interview occurred while she was seated in the backseat of LT Hall's patrol car waiting for SA Mayo to arrive. As previously discussed, LT Hall *1351 offered Defendant Salman and her son the use of his unmarked car for their comfort. LT Hall asked the Defendant just enough questions to establish the make of vehicle Mateen drove the previous night. Approximately one hour transpired between the first contact between LT Hall and the arrival of SA Mayo. A very small portion of this hour was devoted to questioning the Defendant. SA Mayo was on scene for about one and one-half hours, all but 15-20 minutes involved waiting for a female officer to arrive.
The questioning at the station occurred over the course of approximately one hour, followed by a break to transfer his child to Mr. Abasin, followed by 90 minutes of questioning, with much of the balance of the four hours spent waiting for SA Enriquez to arrive. The interview conducted by SA Enriquez began around 12:30 p.m., with the advice of Miranda and Consent to Polygraph forms being completed by the Defendant. The last statement was reviewed and signed by the Defendant at 4:43 p.m., meaning SA Enriquez interviewed the Defendant for around four hours and generated three written statements. In total, the Defendant was questioned for about 6.5 hours.
The duration of the interview must be viewed in context. Defendant Salman agreed to wait for SA Mayo, never asked to leave the apartment complex, and did not ask LT Hall to call anyone on her behalf. Similarly, she volunteered to speak with SA Mayo at the scene and agreed to accompany him to the FBI field office. Once there, and after eating breakfast, she was interviewed for less than an hour before Mr. Abasin arrived to pick up her son. When Mr. Abasin left the FBI officer with the Defendant's son, she agreed to stay and continue speaking with the agents. The interview went on for about 90 minutes, and the Defendant was afforded restroom breaks. While waiting for SA Enriquez to arrive, the Defendant appeared to take a nap, indicating a lack of coercion. Upon meeting SA Enriquez, the Defendant was advised of her rights and began the time-intensive process of answering questions, waiting for SA Enriquez to memorialize the statement, reviewing the statement, and making changes or additions to the statement. At least one other agent witnesses the Defendant verify her statement. This process was repeated 3 times. At one point, the Defendant wanted to speak with her son, and agents placed the call for her. These facts do not suggest a coercive atmosphere, notwithstanding the 5.5 hours of questioning. See Berghuis v. Thompkins, 560 U.S. 370, 386, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) ("[T]here is no authority for the proposition that an interrogation of [three hours] is inherently coercive") (citing Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), for premise that even where statement is given following an 8-9 hour interrogation, suppression requires some official coercion such as taking advantage of defendant's deficient mental condition). The Court does not find the duration of the questioning rendered the statements involuntary.
Finally, while the Defendant characterizes the introduction of SA Enriquez as an improper interrogation tactic-the so-called bait-and-switch-the Court finds SA Enriquez was not brought into the interview process as a ruse. That is, SA Enriquez was not presented to the Defendant as an opportunity to clear her name through the polygraph examination only to thereafter use the polygraph as a deception to obtain the waiver of Miranda rights. SA Enriquez testified to the procedure he employs prior to administering a polygraph examination. He followed that procedure in this case. As in all investigations, he advised the Defendant that the pre-polygraph interview may dispense with *1352 the need for a polygraph examination. This reality does not mean SA Enriquez was engaged in deception or a bait-and-switch. There is simply nothing coercive about advising an interviewee of her right to decline to take a polygraph along with her Miranda warnings. To the contrary, SA Enriquez twice told the Defendant that she did not have to speak with him, could stop at any time, and could decline to answer questions. Defendant Salman was also advised of her right to have counsel present. SA Enriquez's conduct was not deceptive: it was transparent and was designed to insure the Defendant knew her rights. The introduction of SA Enriquez into the investigation strengthens the Government's argument that the Defendant's statements were voluntary and the product of a free will uninfluenced by threats or coercion.
V. CONCLUSION
For the foregoing reasons, Defendant Salman's Motion to Suppress her statements (Doc. 107) is DENIED.
DONE AND ORDERED in Orlando, Florida, on February 2, 2018.

The transcript of the motion to suppress will be cited by the docket number and the relevant page and line numbers.

In her motion, Defendant Salman originally argued that a seizure occurred once the Fort Pierce Police ordered her out of her house after which she was "confronted by multiple officer[s] (sic) with their guns drawn." (Doc. 107, p. 21). At the conclusion of the evidentiary hearing, however, the defense conceded that the alleged unlawful seizure began "at the point she's directed to the vehicle." (Doc. 186, at 22:22-24). Hence, the Court need not address whether the initial contact with Ms. Salman during which police asked her to come outside constitutes an unlawful seizure lacking the requisite showing of probable cause.

LT Hall knew the FBI was applying for a search warrant to search the apartment and could not allow Defendant Salman to remain inside. (Id. at 54:23-55:12).

Later that morning, after Defendant Salman had been seated in the backseat of the patrol car with her son, a female officer arrived and patted her down. (Doc. 186, p. 12:7-14).

SA Mayo was at the complex for approximately an hour and a half, departing with Defendant Salman at around 7:15 a.m. (Id. at 123:3-5).

Agents were obtaining a search warrant for her car, so Defendant Salman could not take it to the FBI office. (Id. at p. 124:21-24).

Government Exhibit 24 is a photograph of the conference room with a table that accommodates ten (10) people.

On cross-examination, defense counsel asked Mr. Abasin if he heard somebody say "she stays" to which Mr. Abasin replied, "I'm not sure, yes, yes." (Id. at 79:14-15).

Mr. Abasin, and the FBI agents, contradict Defendant Salman who writes in her affidavit: "My brother-in-law came at around 9:30 a.m.... As I started to leave with him, one of the F.B.I. agents came up beside me suddenly and said 'No, we are just talking' and blocked the exit. Based on what the agent said, and did to block me, I felt I could not leave, so my brother-in-law took my son, and I stayed." (Doc. 107-1, ¶ 15).

SA Sypniewski told Defendant Salman that video showing her at the gun range existed after which the Defendant admitted to going to the range with Mateen. (Doc. 184, p. 141:4-17). However, no video of the Defendant at the gun range exists. (Id. ).

Government Exhibit 24 is a photograph of the conference room where SA Enriquez interviewed the Defendant. The room appears to be large enough to comfortably accommodate 4 adults, and one wall is comprised of sliding glass doors exiting onto a balcony.

In her declaration, the Defendant claims SA Enriquez said if she lied her son would be taken away and be given to a Christian family. (Doc. 107-1, ¶ 20).

The second statement was completed at 3:27 p.m., and the third statement was finished at 4:43 p.m. (Doc. 107-6, pp. 12, 15). The three statements were admitted into evidence as Government Exhibit 23.

In Kaupp, police officers woke an adolescent in the middle of the night with the words "we need to go and talk," took him from his house "in handcuffs, without shoes, dressed only in his underwear in January, placed in a patrol car, driven to the scene of the crime and then to the sheriff's offices, where he was taken into an interrogation room and questioned." Kaupp, 538 U.S. at 631, 123 S.Ct. 1843.

The Court cites to the record only when quoting testimony not previously discussed in Section III.

While the defense argues the moment of detention occurred when Defendant Salman sat in LT Hall's patrol car, the Court will address the Defendant's transportation to the FBI Office in the context of whether an unlawful seizure had occurred.

Defendant Salman states in her affidavit that SA Mayo directed her to accompany him to the FBI Office, but the Court credits the testimony of SA Mayo over the Defendant's recollection of the events.

Even assuming arguendo that the initial police encounter with Defendant Salman was not consensual, the initial encounter was a proper investigatory stop based upon the information generated during the investigation of the Pulse shooting to include Mateen's claim that he possessed bombs. United States v. Holloway, 290 F.3d 1331, 1335 (11th Cir. 2002). The 45-minute delay between the removal of Defendant Salman from the apartment and the arrival of SA Mayo did not convert the investigative stop into a detention under the facts of this case. United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) ; see also United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000) ; United States v. Legette, 260 Fed.Appx. 247, 251 (11th Cir. 2008).

The reasonable person standard consists of a reasonable innocent person. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

The Defendant's Motion to Suppress focuses upon questioning by SA Mayo. (Doc. 107, p. 9).

The defense cites United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006), for the proposition that where a defendant uses his phone, this fact weighs against custody. The court in Brown did in fact note Brown's use of his phone as one of several factors indicting he was not in custody, but that fact was not outcome determinative. In fact, the court also observed that the police confiscated Brown's only pair of shoes and that act fell short of evidence of an "extensive" restraint. Id.

The Court in Fields was confronted with whether a prisoner who is interviewed about a crime that occurred outside of the facility must be advised of his Miranda rights and declined to impose a bright-line rule. Howes v. Fields, 565 U.S. 499, 514, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012).

Mr. Abasin arrived at the FBI Office at around 9:55 a.m., so the interview by SA Mayo ended at approximately 11:30 a.m. The Defendant arrived at the FBI Office around 7:35 a.m., so the questioning went on for three (3) hours exclusive of restroom breaks and stopping to meet Mr. Abasin.

Defendant Salman attests in her declaration that while she recognizes her signature on the Advice of Rights form, she does not recall reading it or having it explained to her. (Doc. 107-1). The Court had the opportunity observe SA Enriquez testify and finds him to be credible. The Court does not find the Defendant's declaration to be credible.

This Court also finds that Miranda warnings were not required prior to SA Enriquez's interview of the Defendant, because she was not in custody. The Defendant agreed to speak with SA Enriquez, and there had been no material change in the circumstances between the conclusion of her interview with SA Mayo at approximately 11:30 a.m. and the commencement of her interview with SA Enriquez an hour later.

The Court's holding in Seibert is intended to deter officers from consciously withholding Miranda warnings until after a confession is procured. In the instant case, SA Enriquez did not know that Defendant Salman had told SA Mayo her husband purchased a rifle. As a result, the policy behind the Court's analysis in Seibert does not apply here. SA Enriquez cannot use Miranda to reaffirm or cleanse a pre-Miranda statement made by the Defendant which he was unaware of. (Doc. 184, 196:5-10).

Defendant Salman also cites to the fact that she remained at the police station for another six hours before being released. (Doc. 107, p. 17). It is unclear how post-confession detention renders the prior statement involuntary. The Court rejects this as being a valid factor for consideration.

The Education Evaluation Report for Defendant Salman's junior year attributed her academic difficulties to "possible bilingual interference and/or processing deficits," and her history teacher indicated "Noor generally works hard with English written fluency somewhat below her spoken fluency." (Doc. 107-2, p. 22).

Dr. Frumkin's opinions that Defendant Salman is susceptible to providing a false confession goes to the weight the jury will attach to her statements. Based on the record presented by the parties, the Court does not find the Defendant falsely confessed to the facts stated in her statements.